No. 21,045.

HALLIE COOPER, *Appellee*, v. J. A. COOPER and CYNTHIA COOPER, *Appellants.*

### SYLLABUS BY THE COURT.

1. ALIENATION OF AFFECTIONS — *Duty of Parents towards Son's Wife.* The parents of a nineteen-year old son owe no legal duty towards that son's wife, except not to meddle intentionally with their son's affections for his wife.

2. SAME—*Insufficient Evidence against Mother-in-law.* A mother-in-law is not guilty of alienating her infant son's affections for his wife merely because she disliked the wife and regretted her son's marriage, and expressed her belief that because of his extreme youth he was not fitted for the responsibilities and duties of a married man.

3. SAME—*Insufficient Evidence against Father-in-law.* A father-in-law is not guilty of alienating his infant son's affections for his wife merely because he gives his son financial assistance to attend school after the wife has refused to live with the son on account of his inability to support her, and when in good faith the father sought to improve his son's earning capacity by improving his education.

4. SAME—*Judgment Not Sustained by Evidence.* Evidence examined and held insufficient to sustain a judgment in favor of plaintiff against her parents-in-law for the alienation of her husband's affections.

Appeal from Allen district court; OSCAR FOUST, judge. Opinion filed February 9, 1918. Reversed.

*R. E. Cullison, Frank R. Forrest,* and *B. E. Clifford,* all of Iola, for the appellants.

*F. J. Oyler,* of Iola, for the appellee.

Cooper v. Cooper.

The opinion of the court was delivered by

DAWSON, J.: The plaintiff recovered a judgment for damages against her father-in-law and mother-in-law for alienating her husband's affections.

On March 10, 1914, the plaintiff, a girl of twenty, married the defendants' son, a youth who was about a month under nineteen years of age. The young husband had no means of supporting his bride, so he brought her to the home of his parents, with whom they resided for some weeks. About May 1, 1914, the defendants permitted plaintiff and her husband to take up their abode on defendants' farm and to use their furniture. ·Early in June the plaintiff and her husband went on a month's visit to. Illinois, and on their return they stayed a week on the farm, and then they moved into furnished rooms in Moran, where they resided until November 12, 1914, when the plaintiff went to Illinois to attend her invalid grandmother. Plaintiff gave birth to a child in Illinois and remained there many months. During her long absence in Illinois she and her husband had become estranged; and he, with some financial aid from his father, had entered school at Emporia. Plaintiff returned to Moran in October, 1915, and on demand of plaintiff the defendant Cooper recalled his son from school, but the young people never resumed relations as husband and wife. Plaintiff caused her husband's arrest for nonsupport, but he was discharged by the examining magistrate. Then she instituted a suit against him for alimony, and commenced this action against the defendants., Issues were joined and the cause was tried to a jury, which gave a verdict for plaintiff for $5,000 against both defendants. Several unimportant questions were answered by the jury, and also the following:

"Q. 4. Before the estrangement of plaintiff and Beryl Cooper, did the defendant, J. A. Cooper, have or exhibit any malice against the plaintiff?
"A. Yes.

.   .   .   .   .   .   .   .   .   .

"Q. 7. Did the defendant, J. A. Cooper, intentionally and maliciously speak any word or perform any act for the purpose of alienating the affections of his son from the plaintiff?
"A. Yes.
"Q. 8. If you answer the foregoing in the affirmative, state what he did or said. (Stricken out by court.)"

A long assignment of errors is presented, the chief of which is that there was no evidence upon which to base the verdict of the jury. To aid the court in testing the correctness of this contention, we have an abstract of 160 pages by appellant and a counter-abstract of 92 pages by the appellee. Both of these bulky compilations have been studied with care. Both are cumbered with an interminable mass of more or less irrelevant matter, designed apparently to show what the defendants did and did not do towards establishing the young people in housekeeping and in business; and what the defendants did and failed to do to show their affection for plaintiff and her baby, which was the offspring of this marriage, and defendants' grandchild. There is also in the record a plethora of letters from plaintiff to her husband while she was in Illinois. The first of these was affectionate in tone, but her later letters were filled with faultfinding, with exasperation at the young husband's failure to pay his bills, his failure to launch himself in some sort of paying business which would enable him to support his wife and child; and between occasional terms of endearment she called him a cad, a calf and a jackass, etc. The letters contained also an occasional allusion to her husband's mother, whom she conceived to be the cause of her young husband's lack of enterprise. The trial court admonished counsel for both parties that much of this correspondence was inadmissible under ordinary rules of evidence, but it all went in by consent or waiver of counsel. (21 Cyc. 1625.)

The law does not require anything whatever from the hands of parents-in-law, except that they do not meddle with the domestic felicity and affections of their son and his wife. The parents may hold aloof, decline to recognize the wife, show no interest in her or her children, or cut off their son without a penny for marrying without their approval. Wise parents-in-law, of course, do none of these things. They usually consider the daughter-in-law an accession to their family, take her into their hearts and affections, and re-live the joys of their own youth in the marital happiness of their children; and when grandchildren come there is commonly a continuous and delightful contest between the youthful parents and the grandparents for first place in the affections of the grandchildren. That is the way it ought to be. Happy the grandparents who

view the matter in that light! But if they fail to do so, they are not to be penalized in damages, unless they are guilty of some intentional acts which tend to alienate their son's affection for his wife.

To support an action against parents-in-law for alienating their son's affections for his wife a much stronger and clearer case is required to be established than against a stranger. (*Powers v. Sumbler*, 83 Kan. 1, 5, 110 Pac. 97; *Multer v. Knibbs*, 193 Mass. 556, 9 L. R. A., n. s., 322, and note; *Brown v. Brown*, 124 N. C. 19, 70 Am. St. Rep. 575; *Beisel v. Gerlach*, 221 Pa. St. 232, 18 L. R. A., n. s., 516; 13 R. C. L. 1471-1475.)

As to Mrs. Cooper, senior, there was no substantial evidence that she meddled with the domestic felicity of her son and daughter-in-law. True, she admonished them against showing an excess of their affections before third parties who might talk about them or laugh at them, and there was some evidence that she disliked the plaintiff. But her relations with her daughter-in-law were very limited. She went visiting in western Kansas and in Colorado for most of the summer and autumn, and, consequently, saw little of her son and plaintiff during the time they lived together. Doubtless Mrs. Cooper, senior, greatly regretted her son's marriage, because of his extreme youth and immature fitness for marital responsibilities, but what mother would do otherwise? All the evidence tends to show that the general conduct of Mr. Cooper, senior, towards plaintiff was kindly, discreet, and tactful. Disregarding the evidence in his behalf and which tended to show that he was disposed to help make the plaintiff's and his son's marriage a success (for the jury might disbelieve that evidence), all that appellee can show is that during plaintiff's prolonged and voluntary absence in Illinois he advanced money to his son to go to school, and that because of his presence at some interviews which he arranged between her and his son on her return from Illinois she was prevented from making a private effort at reconciliation with the latter. Since the son was admittedly incapable of making a statisfactory living for her, and the plaintiff had a good home in Illinois and had avowed her intention to remain there until he could do so, there was certainly nothing wrong in the defendant father

assisting his son to a further education which might bring the result she desired.

As to the presence of Cooper, senior, at the interviews between plaintiff and her husband, those interviews were brought about by the defendant. It was never hinted that he should withdraw and leave the young couple to talk privately. They were disposed to quarrel, and defendant Cooper was trying to make peace and harmony between them. Plaintiff intimated very pointedly that she desired no private conference with her husband. She told him point blank that he would need to produce a doctor's certificate before she would resume marital relations with him.

On January 12, 1915, plaintiff wrote to her husband:

"Beryl I am in a mighty good home and I am as welcome as I ever was before I married you and I intend to stay right where I am until you wake up and prove yourself man enough to support me. . . . Now you take that money you were going to use to come here and look up a job. Every other young fellow around there can make a decent living for his wife and if I were you I would hate to be the only cad. Of course they have to work and it is no disgrace and you are no better than the rest and a boy that has the health and strength that you have ought to be ashamed of hisself if he was too indolent to try and help himself. . . . You can gallivant around and smoke your cigars and act the part of a dude but when it comes to earning you take a lay off. . . .

"Now when you can prove to me you are capable of supporting me and my child I am ready to take up my part but I will not suffer the child to be brought up in poverty as long as I can help it. I will work for it rather than deprive it of the advantages of life. I never had to and never will as long as I stay with my father. Now Beryl I hope you will look at this as I have written now don't wait and depend on your people any longer move for yourself." ·

On February 28, 1915, she wrote:

"You know I always prefer the farm when things are half way respectable but under conditions that you hold never. Perhaps if you read your scriptures you will find where it says something like this when a man shall take unto himself a wife he shall leave his own people and cleave unto her, if you persist in staying there I will say no more you are stubborn about it so I will stay just where I am. . . . You have have had your own way since we have been married and now I will have mine for a while. . . . What a snob and sore head you were and how mean you were with me when you brought me home this summer and I paid my own fare at that yet you think I ought to be willing to live on the doorstep with your people. No, never. You should have married a girl from common stock not Tom Peckham's daughter."

Early in May, 1915, the defendant father-in-law wrote to plaintiff urging her to return to her husband. ·She replied on May 11, 1915, in part, as follows: .  \

"I fully realize Mr. Cooper that it is hard for a parent to realize the errors of their children but surely you do not think that Beryl has played the fair game with me do you.

"You have asked me to be frank with you otherwise I would not have complained.

"He has informed me that he will not stay on the farm neither will he try to do anything else yet he thinks I should return to Moran. If he is not willing to furnish support what inducement would it be for me to return.

"When Beryl is willing to act the part of a man and husband to me I am willing to do my part but until then I will stay with my father. . . .

"Now I am very sorry that this has caused you any unnecessary worry but I feel justified in my action until Beryl proves to me that he is willing to act as a man should act under similar conditions for I do not expect great things all I ask is to be treated fair. . . .

"Best regards to yourself and Mrs. Cooper. Hoping you are not offended at what I have written."

It is conceded that the affections of the young couple were unimpaired when plaintiff departed for Illinois in November, 1914. Excerpts from counsel's brief read:

"Both sides offered evidence in this trial proving that appellee and Beryl had gotten along together lovely up until November 12, 1914, when appellee left for Illinois; . . . Appellee remained with her father in Illinois until in October, 1915, about eleven months. . . . During these eleven months of absence many letters passed between Beryl and appellee, and appellant Mrs. Cooper wrote to appellee one letter just after the birth of the child. . . . These letters show a growing alienation of Beryl's affection from appellee. . . . That during these months of absence Beryl never went to see appellee or his baby, although he wrote her suggesting she could borrow the money from her father to pay her fare home. . . . The appellants never sent the baby any presents. . . . That this was the first and only grandchild the appellants had ever had, and appellants, according to their own testimony, had shown no interest in the child at all; appellant Mrs. Cooper excusing herself for this lack of interest in the fact that she had never seen it. . . . Appellee feeling that herself and baby were abandoned by the baby's father, came back to Moran in October, 1915, to see if she could not persuade Beryl to resume his duties as husband and father. Upon her arrival at Moran she found that Beryl was attending school at Emporia, Kansas, his expenses being paid by appellants, and remonstrated with appellant about their sending Beryl away to school and

leaving her and her baby unprovided for; and asking them to recall Beryl which Mr. Cooper did. . . . Beryl returned to school at Emporia almost immediately, and they brought him down from there twice afterwards; though appellant Mrs. Cooper in her testimony said that she opposed his going to school, but said she thought it was a pity that he should have to stop school now that he had begun. . . . Appellants' whole conduct toward appellee was that of cool aloofness. Appellant Mrs. Cooper never called to see appellee or the baby; never had them to her home but once, and then appellee stayed over night and the next day when Beryl came from Emporia she hurried appellee and Beryl off up town. Appellee told appellant Cooper and Beryl that she required that Beryl go to work to support her and her child and get a doctor's certificate that he was not affected by a venereal disease, neither of which conditions were ever complied with. Appellants met appellee and her baby on the street of Moran and refused to see or recognize them."

This abridged statement from appellee's brief fairly indicates the situation as this court gleans it from an independent study of the abstracts. No alienation of affections existed prior to plaintiff's departure for Illinois. No malicious acts or conduct of defendants tending to cause alienation of their son's affection for his wife thereafter are disclosed to support and justify the judgment. The other errors need no consideration. The judgment of the district court is reversed, and the cause remanded with instructions to enter judgment for defendants.

JOHNSTON, C. J., and WEST, J., dissent from the holding that the evidence does not sustain the verdict and judgment.