Ogg v. Ogg.

---

No. 27,538.

Sophia Ogg, *Appellee*, v. Frank R. Ogg (et al.), *Appellant*.

(260 Pac. 647.)

SYLLABUS BY THE COURT.

1. Husband and Wife — *Alienation of Affections — Parents of Spouse — Evidence—Findings.* In an action by a wife to recover damages from her husband's parents for alienation of the husband's affections, the record considered, and *held*, (a) the evidence was insufficient to support a verdict and judgment for plaintiff, (b) the special findings of the jury considered and held to require a judgment for defendants.

2. Same—*Judgment on Findings.* The proceedings considered, and *held*, it was not error for the court to sustain a motion for judgment on the findings in favor of the defendant, Mary D. Ogg.

3. Same—*Generally.* Various alleged errors considered and held not to be of substantial merit.

Appeal from Johnson district court; Jabez O. Rankin, judge. Opinion filed November 5, 1927. Affirmed in part and reversed in part.

*S. D. Scott* and *S. T. Seaton,* both of Olathe, for the appellant.

*C. W. Gorsuch, C. B. Little,* both of Olathe, and *David F. Carson,* of Kansas City, for the appellee.

Appeal and Error, 3 C. J. pp. 976 n. 27, 978 n. 37; 4 C. J. p. 1004 n. 63. Evidence, 23 C. J. pp. 51 n. 77, 52 n. 78, 53 n. 84, 56 n. 24. Husband and Wife, 30 C. J. pp. 1122 n. 40, 1129 n. 41, 1130 n. 42, 1145 n. 56, n. 60; 9 L. R. A. n. s. 324; 46 L. R. A. n. s. 469; 13 R. C. L. 1471.

The opinion of the court was delivered by

HOPKINS, J.: The plaintiff is the wife of William Ogg; the defendants, Frank R. and Mary D. Ogg, are William's parents. The action was one by the wife to recover damages from her husband's parents for alienation of the husband's affections. Trial to a jury resulted in a verdict for plaintiff. The court set aside the verdict against the mother, but rendered judgment against the father. The father appeals, and the plaintiff has filed a cross appeal from the order setting aside the verdict as to the mother.

The Ogg family has resided in Olathe, Johnson county, for many years. The plaintiff originally lived in Iowa, where she had previously been married and divorced. She attended the state teachers college at Pittsburg, Kan., and was later engaged in teaching school four and one-half miles northwest of Olathe. While teaching she met William Ogg. They became engaged about the middle of April, 1923, and were married at Joplin, Mo., July 31, the same year. They returned to Olathe a few days following, lived with defendants four or five weeks, then moved into an adjacent house, where they continued to live until they where separated, October 6, 1924.

The defendant, F. R. Ogg, contends that the court erred in its refusal to enter judgment for him on the special findings returned by the jury, notwithstanding the general verdict, and that there was not sufficient evidence upon which to base the general verdict of the jury and the judgment rendered against him. The plaintiff argues that the fair inferences, from all the facts and circumstances, were sufficient to support the verdict and judgment even though there was no direct evidence of the alienation of the husband's affections by his parents.

The plaintiff's evidence tended to show that early in their relations, the plaintiff apprised William Ogg that she had previously been married and divorced. He cautioned her to say nothing of it to his parents, as they were much opposed to divorces. Previous to the marriage, upon inquiry, the father was told by plaintiff she had had no serious love affair. In the early winter of 1923 and 1924 Father Ogg became ill and went to the hospital in December, 1923. Plaintiff and her husband went to live with the mother during the time Father Ogg was in the hospital, and when he returned home the plaintiff attended and nursed him. When plaintiff and her husband

returned home, they found the water pipes frozen and their house generally in bad condition. They talked of building and began to negotiate for another and better house. Without relating the details, it is sufficient to say Father Ogg was not favorably impressed with their negotiations, and friction resulted. However, the first matter which indicates friction between the families is related by the plaintiff, to the effect that some time during the summer of 1924 the defendants came to the house where plaintiff and her husband were living, and Father Ogg said, in substance that William had written a check on him of $19.60 for groceries, and that he was paying them $100 a month and thought that should be sufficient for them to live on, that William was present, but that Mr. Ogg directed his remarks to her. He said that William had a mania for spending money; that he did not drink, did not gamble, and did not think he spent it for any immoral purpose, but for her to watch him.

Eventually, about August 1, 1924, plaintiff and her husband agreed to purchase a home for a stipulated price of $2,700. Plaintiff's husband issued a check on Father Ogg's account for $500. The father paid the check, but trouble arose over the transaction. The father claimed the property could have been purchased for $2,200. In the meantime, the father discovered that his son's wife had previously been married and divorced. This caused an estrangement between plaintiff and her husband's parents. The father became active in learning the details of the divorce. He wrote to the clerk of the court in Iowa and obtained a copy of the decree of divorce, which he sent to his son. The father wrote other letters in quest of information concerning the plaintiff's life, standing and conduct previous to her marriage with his son. On October 6, 1924, William had some words with plaintiff, packed up some of his belongings, and went to his father's home. In a short time he returned, laid two five-dollar bills on the table and told plaintiff she could go home or "do anything you want to," and he again left, returning to his father's house. The plaintiff followed him there, and on several other occasions went to the house of Father and Mother Ogg in efforts to have interviews with her husband to persuade him to return home.

The question remains, What did the parents say or do to cause the plaintiff's husband to leave her or to alienate his affections? Certainly they were not to blame because on moral and religious grounds they were opposed to divorces, and were shocked to learn

that their son had married a divorcee. Nor can they be penalized in damages because their attitude towards plaintiff may have changed when they learned that fact, nor because their changed attitude may have had some effect on their son's disposition towards his wife. In rather extensive abstracts filed by both sides, we are unable to discover any culpable thing either of them said or did which caused the separation. The plaintiff testified that she met Father Ogg on the street a few days before the separation, and in a heated conversation he said "he would see that William did not live with me (plaintiff) another day." This conversation occurred on Thursday. William left plaintiff the following Monday. However, plaintiff admitted this word was not brought home to her husband. She also testified that:

"He (Father Ogg) told me that I had better go home to my mother, that William was not coming back. He said, 'I understand, I hear you are going to sue me for alienation of affections, and that you are going to sue mother and Josephine,' and I said I hadn't thought anything of the kind. I hadn't even talked to anybody. He said, 'You can sue us if you want to, but it won't get you anywhere.' . . .

"Mother had told me that William would not come back to me if she could prevent it. She had no respect for a divorcee and no use for divorces. There had never been any divorces in her family of nine children. At a later conversation, she said that she asked Mother Ogg how William was, and she said better, and I asked her when he was coming back and she said he wasn't coming home, and William came in about that time and said for me not to bother mother, for me to go back to the house; and he started out the door, and I started out the door following him, and mother followed me to the door and said: 'Sophia, don't start anything, don't sue us.' In the last conversation I had over at the house, mother said William was not coming back.

"Q. Tell the jury what was said in that conversation? A. Well she said William wasn't coming back, and he would not come back if she could help it; anything she could do to prevent it he would not come back. I went over to the house one evening after that. William and Father and Mother Ogg were there. I talked to mother and father then. I asked Mr. Ogg when William was coming home and he said he wasn't coming home. . . ."

Plaintiff testified that she thought they, or Father Ogg, was trying to get William away from her, but the record other than above and similar quotations, discloses nothing more than surmise. And surmise, conjecture, speculation, plausibility, do not supply the want of proof. Guilt may not be inferred from opportunity. (*Beeler v. Railway Co.*, 107 Kan. 522, 192 Pac. 741.) Pertinent special findings of the jury follows:

"1. What did William F. Ogg do and say when plaintiff showed him the

letter and decree of divorce sent to her by F. R. Ogg?   A.   (*a*) Tore up and threw in wastebasket.   (*b*) 'That's the way of the damned old fool when he gets mad.'   Per Sophia Ogg's testimony.

"2.  Did F. R. Ogg say to his son on October 6, 1924, when he first learned that his son had separated from his wife, that he ought to go back and live with her and try it again.   A.   Yes.   As per F. R. Ogg's testimony.

"3.  Did the plaintiff join her husband, W. F. Ogg, before the marriage in deceiving the defendants, or in concealing from them the fact that plaintiff had been previously married and divorced?   A.   Yes; on instructions from her intended husband, W. F. Ogg.

"4.  After learning from William F. Ogg at the interview testified to by the plaintiff, that he, the said William F. Ogg, knew that plaintiff had been previously married and divorced, did F. R. Ogg say that if it was all right with him, meaning his son, he guessed it would have to be all right with them, meaning F. R. Ogg and Mary D. Ogg, the defendants?   A.   Yes.

"5.  Did the plaintiff communicate to her husband, W. F. Ogg, what she claims his father said to her in front of the Moneta theater a short time before the separation?   A.   No.

"6.  Did F. R. Ogg or Mary D. Ogg, or either of them, ever threaten to disinherit W. F. Ogg if he continued to live with the plaintiff?   A.   No.

"8.  After the interview testified to by the plaintiff in front of the Moneta theater and referred to in question No. 5, did the defendant, F. R. Ogg, so far as the evidence in this case shows, have any talk with his son W. F. Ogg about his marital relations with Sophia Ogg or his separation from her?   A.   No.

"9.  What, if anything, on or prior to the 6th day of October, 1924, the day of the separation, had the defendant Mary D. Ogg said or done to induce W. F. Ogg to leave his wife?   A.   Nothing.

"12.  If you find for the plaintiff, state separately the amount of actual damages you award her?   A.   $10,000.

"13.  If you find in favor of the plaintiff, what amount, if any, do you allow for exemplary or punitive damages.   A.   None."

We are of opinion the court should have sustained the motion of the defendant, F. R. Ogg, for judgment on the special findings.   The jury found, and there was evidence to support the finding, that when Father Ogg first learned that his son had separated from his wife he said to his son that he ought to go back and live with her and try it again.   Perhaps the most important evidence offered by the plantiff was her statement of the conversation which occurred in front of the Moneta theater a few days before the separation to the effect that he, the father, would see that William would not live with her another day.   The jury found that after this interview the defendant had no talk with his son about his marital relations or his separation from her.

The record discloses no substantial evidence showing that the defendants conspired, confederated together or coöperated with each other to alienate the affections of their son from his wife, or to cause their separation. It discloses no evidence that after William Ogg returned to his parental home on the morning of October 6, did he manifest any desire to return to his wife or to be reconciled to her, nor does the record disclose any evidence that the defendant, F. R. Ogg, at any time after William left the plaintiff and returned to the father's home, induced his son by threat or persuasion to remain away from his wife or to do anything save to permit the son to remain in the parental home and afforded him shelter therein. In *Cooper v. Cooper,* 102 Kan. 378, 171 Pac. 5, it was said in the opinion:

"The law does not require anything whatever from the hands of parents-in-law, except that they do not meddle with the domestic felicity and affections of their son and his wife. The parents may hold aloof, decline to recognize the wife, show no interest in her or her children, or cut off their son without a penny for marrying without their approval. Wise parents-in-law, of course, do none of these things. They usually consider the daughter-in-law an accession to their family, take her into their hearts and affections, and relive the joys of their own youth in the marital happiness of their children; and when grandchildren come there is commonly a continuous and delightful contest between the youthful parents and the grandparents for first place in the affections of the grandchildren. That is the way it ought to be. Happy the grandparents who view the matter in that light. But if they fail to do so, they are not to be penalized in damages, unless they are guilty of some intentional acts which tend to alienate their son's affection for his wife. To support an action against parents-in-law, for alienating their son's affections for his wife, a much stronger and clearer case is required to be established than against a stranger." (p. 380.)

In *Meek v. Meek,* 118 Kan. 106, 108, 233 Pac. 1032, it was said in the opinion:

"In an action for alienation of affections brought against a parent of the plaintiff's spouse, proof of a higher degree, if not of a different kind, is required than in the case of a stranger. (30 C. J. 1129, 1130, 1145; *Cooper v. Cooper,* 102 Kan. 378, 171 Pac. 5; *Erickson v. Erickson,* 98 Kan. 244, 158 Pac. 48; *Eagon v. Eagon,* 60 Kan. 697, 57 Pac. 942.)"

What has been said necessarily disposes of plaintiff's cross appeal. There was substantial testimony supporting the findings of the jury that Mary Ogg did nothing to induce William to leave the plaintiff.

Complaint that the court erred in refusal to admit evidence offered by the plaintiff cannot be sustained. The proffered testi-

mony could not, in our opinion, have changed the result. Moreover, it was not offered on a motion for new trial, and error cannot be predicated upon its rejection. (*Rooney v. McDermott,* 121 Kan. 93, 246 Pac. 183.)

The judgment, in so far as it pertains to the plaintiff's cross appeal, is affirmed. In so far as it relates to the defendant, F. R. Ogg, it is reversed and the cause is remanded with instructions to enter judgment for the defendant.