No. 27,841.

ANNA F. WOHLFORT, *Appellee,* v. LOUISE C. WOHLFORT et al., *Defendants;* BESS M. WOHLFORT and CARRIE L. SANDELL, *Appellants.*

(263 Pac. 1052.)

SYLLABUS BY THE COURT.

1. HUSBAND AND WIFE—*Alienation of Affections—Parents and Sister of Spouse—Evidence.* In an action by a wife to recover damages from her husband's mother and sisters for alienation of the husband's affections, the record considered, and *held,* the evidence was insufficient to support a verdict and judgment for plaintiff.

2. SAME—*Alienation of Affections—Parents and Sister of Spouse—Rule as to Weight of Evidence.* The rule that "to support an action against parents-in-law for alienating their son's affections from his wife, a much stronger and clearer case is required to be established than against a stranger," also applies to the sisters of the husband.

Appeal from Republic district court; JOHN C. HOGIN, judge. Opinion filed February 11, 1928. Reversed.

*Park B. Pulsifer, Clyde L. Short,* both of Concordia, *C. W. Burch, B. I. Litowich* and *La Rue Royce,* all of Salina, for the appellants.

*W. D. Vance, R. E. McTaggart* and *H. H. Van Natta,* all of Belleville, for the appellee.

The opinion of the court was delivered by

HOPKINS, J.: Plaintiff brought this action against Louise C. Wohlfort, mother of her husband, and Bess M. Wohlfort and Carrie L. Sandell, sisters of her husband, for damages for having alienated her husband's affections. A demurrer to the evidence by Louise Wohlfort was sustained, but judgment was rendered against the husband's sisters and they appeal.

The facts are substantially these: Anna F. Wohlfort and her husband, Axel T. Wohlfort, were married January 25, 1911. For seven-

Conspiracy, 12 C. J. p. 639 n. 90. Husband and Wife, 30 C. J. p. 1145 n. 56; 46 L. R. A. n. s. 469; 13 R. C. L. 1473.

teen years prior thereto she had lived in Chicago. She was an old acquaintance of her husband and his family. At the time of the marriage the Wohlfort family consisted of Thure Wohlfort, the father; the mother, Louise C. Wohlfort; Carrie L. Sandell, Bess M. Wohlfort, and Axel. The father died in 1916, leaving a large estate, and a will under the terms of which his property was left to his wife and daughter Bess. From the time of their marriage in January, 1911, until May, 1922, the plaintiff and her husband lived on a farm of 320 acres near Scandia belonging to the mother, Louise C. Wohlfort. In May, 1922, they moved to Chicago, where the parents and family of the plaintiff resided. At that time they were heavily involved at the bank in Scandia, and the mother did not wish them to move away. They started for Chicago with an old Buick automobile, $50 in cash a present from the mother, and $25 they had borrowed from the bank. In Chicago they purchased the furniture for a rented flat with money borrowed from plaintiff's brother-in-law. While in Chicago the husband worked at various jobs. The plaintiff became ill, in the fall underwent a major surgical operation and was in the hospital for several weeks. More than a year before the plaintiff and her husband moved to Chicago, Carrie Sandell moved from Scandia to Topeka. During plaintiff's illness, her sister Emphrey, who lived in Chicago, under date of October 31, 1922, wrote the defendant, Carrie Sandell, and to the mother and sister Bess at Scandia suggesting they help Axel and plaintiff. After plaintiff returned home from the hospital, her husband concluded to go to Topeka in quest of work, Carrie Sandell having written him she believed she could help him get work there. The plaintiff and her husband discussed the move with plaintiff's sister, who took Axel to the train when he left for Topeka, December 15, 1922. After reaching Topeka, he attempted to procure work but failed. Shortly thereafter, during the Christmas holidays of 1922, Axel went to Scandia to visit his mother and sister Bess, remained there about two weeks and then returned to Topeka. Failing to get work in Topeka, and having earned no money, he went, in the spring of 1923, to the home of his mother near Scandia. He carried on a correspondence with plaintiff until March 19, 1923. In September, 1923, the plaintiff returned to Republic county. A week later, without having talked to her husband or made any effort to do so, she commenced an action against him for alimony, joining as defendants the mother, Louise C. Wohlfort and Bess M. Wohlfort, alleging in sub-

stance that the will of the father, Thure Wohlfort, had been withheld from probate for more than three years, and that by reason thereof her husband Axel had a one-sixth interest in the real property of which Thure Wohlfort had died seized. She was successful in having the court set off to her as permanent alimony a one-sixth interest in 786 acres of the land owned by Thure Wohlfort at his death, and this court affirmed the judgment. (*Wohlfort v. Wohlfort,* 123 Kan. 142, 254 Pac. 334.)

At the time the plaintiff and her husband moved to Chicago, and since the death of Thure Wohlfort, the widow, Louise, and the appellant Bess, have continued to live alone on the home farm near Scandia. The mother was old and Bess assisted in looking after the property. After Axel left, the mother paid to the local bank at Scandia his note of $1,253.76. While plaintiff was in the hospital or later, the mother, Louise, through the defendant, Bess, sent Axel on November 2, $200, and on November 16, $300, to pay for the surgeon's and hospital bills. About the same time, the mother and Bess sent other and additional sums to Chicago for Axel and plaintiff. The last item paid was a note of $233 given by Axel to plaintiff's brother-in-law for the money with which they had purchased the furniture in the flat. This was paid by the mother after Axel left Chicago and after receipt of letters from plaintiff and her sister in relation thereto.

A contention by the defendants that the evidence was insufficient to sustain the judgment is, we think, well founded. The plaintiff sought to show a conspiracy between the defendants to cause a separation between the plaintiff and her husband in 1912, some ten years before the separation. The father, Thure Wohlfort, was charged as being their agent. The plaintiff testified that difficulties arose between her and the mother and sisters of her husband about July, 1912. That—

"We were at the Wohlfort's, and there was some difficulty that took place during the time of eating dinner, and we were just talking about being fat or thin, and Mrs. Sandell said that we should compare them the same as we would an animal—a hog, for instance; that a fat hog was better than a thin hog. There were three thin ones there, Mr. Sandell, Mr. Axel Wohlfort and myself; and I said, 'Harvey, stand up there; you are one of us,' and Mrs. Sandell got very mad at me for that remark, but it was meant just for a joke, and I meant no offense whatever."

And substantially on another occasion:

"The first of August, 1912, my sister, Mrs. Jones and my husband and myself

Wohlfort v. Wohlfort.

were walking down the street in Scandia, going east to get our team to drive home, and Bess came up after us or back of us and said, 'Axel, mother wants to see you at Carrie's.' And my sister and I walked on slowly, and Axel stood and talked for a minute and we went on to get our team, and going down there we stopped in front of Sandell's and Mrs. Sandell and Mrs. Wohlfort and Bess all came out to the walk and the first word that was spoken Bess said, 'Anna, mother don't want to see you,' and the next thing that happened, Carrie stepped forward and shook her fist in my face and said, 'We were happy until you came into our family.' Then Mrs. Wohlfort said, 'Axel, I am going to faint, come and catch me.' And with that he jumped out of the buggy and they took Mrs. Wohlfort into the home and I suppose they called a doctor, because I saw him come down. Bess came out then and said, 'Anna, drive away; I can't stand to look at you. We will send father up to settle this with you.'"

Plaintiff further testified that the father came to her house on the farm and said that the women folks told him that she and Axel had had trouble, and sent him up to ask her how much she would take to move back to Chicago; that in reply she stated: "Father Wohlfort, I didn't get married to be paid off to leave my husband, and Axel and I get along all right." She also testified concerning interference by defendants with her husband, to the effect that her husband "would never sell or buy anything unless he consulted them." Also that on one occasion:

"We were in the kitchen, Mrs. Wohlfort, Bess and I. Bess was washing dishes and I was drying them, and Mrs. Wohlfort proceeded to tell me that they had bought everything we had, even the stove we cooked on and the table we ate on, and that sort of thing; I didn't think she was right about it, and I began to figure up some of the things we had done about putting the different improvements on the farm and proceeded to say that we had got several things and put on the farm, and that I thought that ought to offset the claim that she claimed was owed her; and she began to walk the floor and wring her hands and said, 'If I faint call the doctor,' and Bess sent me to call Axel, and I went out and called him. As he came in he said, 'Oh, pshaw, mother, why do you act like this?' And then Mrs. Wohlfort at another date when she and I were alone said that she thought that each person should take care of their own children."

Delma Nelson, a witness for plaintiff, testified to a conversation with Axel Wohlfort in 1914 or 1915:

"He said he had to do absolutely as they (defendants) said; that he couldn't do anything the way he wanted to do it; and that he was under their thumb, and that he would be disinherited unless he done as they said."

With reference to the family quarrel in August, 1912, the plaintiff testified also that she went to the Sandell home and stayed there with

Mrs. Sandell and her husband, and Axel went home with his mother and came back the next morning, when she and Axel went back on the farm; that they continued to reside there for ten or eleven years, during which time she visited at the Wohlfort and Sandell homes; that they were reconciled and all visited back and forth; that up until the time she and her husband went to Chicago they had family gatherings and reunions either at her home or the Sandell or Wohlfort home; that prior to her leaving for Chicago, after she and her husband quit farming, they stayed two weeks at the Wohlfort home with Mrs. Wohlfort and Bess; that she and her husband were rather heavily indebted to the bank at Scandia at the time they ceased farming operations and owed something like $1,300 at the bank which was paid by Mrs. Wohlfort; that while she and Axel lived in Chicago, Carrie Sandell and her husband and son visited her and her husband and that she corresponded with Mrs. Sandell until her sickness; that the last time she heard from Carrie was just before her sickness, "she wrote me that her son was in the hospital and was being operated on, and I answered her letter and she wrote me again, but I didn't have time to answer that before I was taken to the hospital;" that she knew before Axel left Chicago that he had received a letter from his sister at Topeka; knew that he was going there and that it was entirely satisfactory to her that he should go; that she corresponded with Axel after he left Chicago for some considerable period; that she received a letter from him saying that Harvey and Carrie had suggested that she and Axel go into the poultry business.

Edith Jones, plaintiff's sister, testified that she visited plaintiff and Axel in 1915, and that both were congenial; that she was living in Chicago in May, 1922, and saw them frequently, and their relations were very pleasant.

Delma Nelson, friend and neighbor of plaintiff, also testified that she was acquainted with plaintiff and her husband; as long as they were on the farm and they got along nicely.

We are of opinion that the affair in Scandia in August, 1912, was but an ordinary "in-law" row. There was no showing of a conspiracy except the claimed disagreement in Scandia in 1912, after which there is nothing to indicate but that the plaintiff and her husband lived happily together; that they visited back and forth with defendants down to the time of the separation at the end of 1922. The trial court at the conclusion of the evidence sustained a demurrer as

against the mother. If a conspiracy had been shown, the mother was a conspirator as much as the others. The evidence clearly shows that whatever Thure Wohlfort may have said or done in 1912 had no effect. There was no showing that Thure Wohlfort's suggestion that plaintiff go to Chicago was ever brought home to Axel. He and the plaintiff lived in peace and harmony and the families went along as usual. If any inference properly could be drawn that there was a conspiracy, it necessarily ceased at Thure Wohlfort's death. (See *Rickel v. Coöperative Exchange,* 113 Kan. 592, 215 Pac. 1015; *Chisler v. Randall,* 124 Kan. 278, 259 Pac. 687; 12 C. J. 639.)

The plaintiff insistently argues that portions of letters written by the defendants were extremely significant; that in connection with other acts and statements, the letters of the defendants to plaintiff's husband show their intention and purpose to separate her and her husband, and their wanton disregard of her and her rights. On their part, the defendants contend that the letters from them to Axel were prompted at least in part by one from Emphrey Peterson, plaintiff's sister, to Carrie Sandell in which emphasis was laid upon plaintiff's illness, Axel's failure to procure work, lack of funds and especially that:

"He is in no condition to work or even look for work, for I know he couldn't hold a nail steady enough to drive it in. I am desiring that you know his true condition and feel that it is my duty to write you."

This letter undoubtedly was written for the purpose of interesting the defendants in their brother's condition to the end that they might assist him. Its receipt must have caused considerable anxiety on the part of the defendants for their brother. It was perfectly apparent that plaintiff who was ill, recovering from an operation, could not then come, and it was no more than natural if the defendants thought that she could remain with her own folks until she recovered. Malice could not be inferred from the mother and sisters desiring the son and brother to come home. That they worried about his condition is evidenced by their letters. Nor did the letters need explanation. Defendants were concerned about Axel and desired to help him. A letter from Carrie to Axel in answer to one from him, and immediately after receipt of Emphrey's letter, stated that the doors were open wide and for him to come home. Others gave hope of his procuring work in Topeka. Without giving them an utterly strained construction, it is impossible to interpret them as

showing an effort to separate husband and wife. To the contrary, letters from Axel to the plaintiff indicate clearly there was no attempt by the defendants to separate them. Axel wrote his wife on December 16, 1922:

"I forgot to take those oranges your mother left for me. You eat them for me. . . . I think I will go down to the Santa Fe to-morrow to apply for a job. . . . I haven't news to write about until I land something. I might run down home pretty soon. Greet everybody and write often."

December 19:

"Are you going to have Lute fish for Xmas. . . . Better come and have fish with us. . . . Greet everybody for us and do not forget to write. I am going to the folks at Scandia for a few days."

December 21:

"DEAR ANNA—I rec'd your letter to-day. Glad that you are improving. I am home with the folks; will stay here until Xmas, then I will go back to Topeka."

February 13 he wrote:

"DEAR ANNA—I rec'd your letter yesterday; glad to hear from you. How are you getting along now? I wish that you were well so that you and I could go in poultry business. . . . What do you think about the poultry business? We could try it for awhile. Carrie and Harvey thinks that would be pretty good to go into. It does not require much of a capital to start with. Carrie, Hubert and Harvey said that we could stay with them until we get a start. What do you say?"

The Harvey and Hubert referred to were Harvey and Hubert Sandell, the husband and son of the defendant, Carrie Sandell. So it appears that as late as two months after Axel came to Topeka, Carrie Sandell was offering them a home until they could get started. On the other hand, letters from the plaintiff to Axel indicated a feeling not at all conducive to continued affection. This may have caused a cooling of Axel's ardor. In one she said:

"This letter, Axel, may seem like nagging but if you had any other woman to deal with but an easy mark like me, you would have something on your hands besides nagging."

In *Meek v. Meek*, 118 Kan. 106, 233 Pac. 1032, this court discussed the evidence necessary to sustain a judgment. It was said in the opinion:

"In an action for alienation of affections brought against a parent of the plaintiff's spouse, proof of a higher degree, if not of a different kind, is required than in the case of a stranger. . . . Here in the judgment of this court there is an entire lack of what the law regards as evidence to support a finding of malice, improper motive or actual interference in the relations be-

tween the plaintiff and her husband. True the fact that the change in the attitude of the plaintiff's husband towards her began at the same time as the whispered conferences between him and his mother, naturally gives rise to a suspicion that the relation of cause and effect existed; but without some knowledge of what was said, no valid inference can be drawn as to what it was or whether it was of a character to expose the defendant to legal liability. The gap in the plaintiff's case cannot be supplied by the circumstance that after her departure had been determined upon the defendant packed her trunk." (pp. 108, 109.)

In the instant case there is not only a presumption of worthy motives, but direct proof thereof in the correspondence. Axel's remaining in Topeka, if his move there had not been explained, might have given rise to suspicion that the relation of cause and effect existed, but without some knowledge of what was said or done, no valid inference can be drawn as to what it was, or whether it was of a character to expose the defendants to legal liability. As said in the Meek case, the gap cannot be supplied by circumstances. The evidence was to the contrary, so the presumption must be to the same effect. In this case as in that, there was nothing more than a suspicion. Here with full knowledge of the plaintiff and her family, the husband departed for Topeka. He corresponded with her until March of the following year. She complained of his not working, and the inference may properly be that he became tired of it. The fact that he stayed in Topeka until March and then went to his mother's home raises no presumption that defendants alienated his affections. The court in sustaining the demurrer to the evidence as to the mother, in effect found that the mother had a right to harbor her son in her home.

"As has been well said, 'a father's house is always open to his children; and whether they be married or unmarried, it is still to them a refuge from evil and a consolation in distress.' Natural affection establishes and consecrates this asylum, and if a wife has determined to separate from her husband, it is natural for her to return to her father's house, and it is natural for her parents to receive her and afford her shelter and support." (13. R. C. L. 1472.)

In *Cooper v. Cooper,* 102 Kan. 378, 171 Pac. 5, it was said:

"The law does not require anything whatever from the hands of parents-in-law except that they do not meddle with the domestic felicity and affections of their son and his wife. The parents may hold aloof, decline to recognize the wife, show no interest in her or her children, or cut off their son without a penny for marrying without their approval. . . . To support an action against parents-in-law, for alienating their son's affections for his wife, a much stronger and clearer case is required to be established than against a stranger." (pp. 380, 381.)

16—125 Kan.

This court in the late case of *Ogg v. Ogg,* 124 Kan. 443, 260 Pac. 647, reaffirmed the position taken in the Cooper and the Meek cases, *supra.* The claimed statements of the father to the plaintiff in 1912 were not brought home to and had no effect upon the husband. Other than the letters, no statement made by defendants with reference to doubtful family relations was shown to have been brought home to plaintiff's husband. Plaintiff's testimony as to what the mother had said before the couple moved to Chicago was not shown to have been communicated to him or that he was in any way influenced thereby. Nor from the time Axel left Chicago was there anything spoken or written which affected him in his relations with his wife. As was said in *Ogg v. Ogg,* supra, "surmise, conjecture, speculation, plausibility, do not supply the want of proof. Guilt may not be inferred from opportunity." (See, also, *Eagon v. Eagon,* 60 Kan. 697, 57 Pac. 942; *Powers v. Sumbler,* 83 Kan. 1, 110 Pac. 97; *Erickson v. Erickson,* 98 Kan. 244, 247, 158 Pac. 48.)

"Merely giving advice to a wife, which induces her to leave her husband, is not actionable if given honestly, with a view of the welfare of both parties." (13 R. C. L. 1466.)

"And it has been said that the conduct of parents in such cases is to be liberally construed, and worthy motives are to be presumed. This rule has more frequently been applied in the case of advice given to a married daughter, but it is equally applicable in the case of advice given to a son." (13 R. C. L. 1473.)

It has been held that the presumption that applies to the parents also applies as to the sisters. (See note and authorities cited, 46 L. R. A., n. s., 469.)

The conclusion at which we have arrived renders unnecessary discussion of other questions raised in the briefs.

The judgment is reversed and the cause remanded with instructions to render judgment for the defendants.

BURCH, J., not sitting.