WALLACE, Respondent, *v.* WALLACE, Appellant.

(No. 6,487.)

(Submitted June 25, 1929. Decided July 16, 1929.)

[279 Pac. 374.]

494

Mr. *W. J. Paul* and *Messrs. Murphy & Whitlock,* for Appellant, submitted a brief; *Mr. Paul* and *Mr. A. N. Whitlock* argued the cause orally.

*Messrs. Stewart & Brown, Mr. S. P. Wilson* and *Mr. Harry H. Parsons,* for Respondent, submitted a brief; *Mr. Parsons* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

The plaintiff herein, Helen Mary Wallace, brought action in February, 1927, against Martha J. Wallace, mother of plaintiff's husband, William Hibbs Wallace, for the alienation of her husband's affection. Issues being joined, the cause was tried before the court and jury. At the close of the taking of all testimony, defendant moved for a directed verdict, which motion was overruled and the jury instructed as to the law of the case. The jury returned a verdict in favor of plaintiff for $20,000, and judgment was duly entered thereon. Defendant moved for a new trial, which motion was denied. Defendant has appealed from the judgment, and herein makes numerous assignments of error, raising the questions herein discussed.

The undisputed evidence discloses the following facts: The plaintiff, referred to throughout the testimony as "Ella May," and hereinafter so called for convenience, met William Hibbs Wallace, known and hereinafter referred to as "Billy," while the two were students at the State University, and there became engaged during the school year of 1923–24. Upon graduation in 1924, plaintiff went to California, where she taught school, and the engagement was broken off in the fall of that year because of religious differences, plaintiff being a Catholic and Billy a Protestant.

Plaintiff returned to Montana in the summer of 1925, and called Billy by 'phone from Butte, and thereafter twice visited the home of defendant and Billy, in Powell county, at the invitation of defendant. On August 5, 1925, the young couple were married in Butte by a Catholic priest, and at that time Billy signed an agreement that any children born to them

should be raised in the Catholic faith. At that time a partnership existed between defendant and Billy in conducting ranching operations on a large ranch, left to defendant during her lifetime, and to Billy on her death, by defendant's deceased husband.

The young couple went to the ranch immediately after their marriage, and they and the defendant jointly made the ranchhouse their home for more than a year thereafter. From January to the latter part of April following the young couple were absent in Europe.

Plaintiff was confined in a hospital in Missoula in July, 1926, and there gave birth to a child on the 18th of that month; she remained in the hospital until the fifth day of September, when she returned to the ranch with her baby, and with a nurse in attendance. She was met with coldness on the part of Billy and his mother; Billy sent the nurse back to Missoula almost immediately, and left the ranch the same night and did not return. On September 28, 1926, he commenced divorce proceedings, which resulted in a decree in favor of the wife and the award to her of alimony in the sum of $150 per month for her support and the care of a delicate child requiring frequent medical and surgical treatment.

In oral argument we were advised that this was a second trial of this cause, the first having resulted in a verdict in favor of plaintiff for $40,000, which verdict was set aside by the trial court as excessive.

1. It is first contended that the evidence is insufficient to warrant the submission of the case to the jury or to justify the verdict and judgment.

In considering this assignment, we are bound by the following well-established rules circumscribing our right to review the evidence: So long as we retain the jury system and our present statutory provisions with regard thereto, courts and litigants must abide by the decision of the jury respecting the weight of the evidence and the credibility of the witnesses;

these are matters with which this court, on appeal, has nothing to do. (*Chicago Title & Trust Co.* v. *O'Marr,* 25 Mont. 242, 64 Pac. 506.) A jury may believe the testimony of one witness and disbelieve that of another, or any number of others, and the determination of the jury in this regard is final; having spoken, this court must assume that the facts are as stated by the witnesses believed by the jury, and claimed by the prevailing party. (*Hanson Sheep Co.* v. *Farmers' etc. State Bank,* 53 Mont. 324, 163 Pac. 1151; *Watts* v. *Billings Bench Water Assn.,* 78 Mont. 199, 253 Pac. 260.) The preponderance of the evidence may be established by a single witness as against a greater number of witnesses who testify to the contrary. (*McQuay* v. *McQuay,* 81 Mont. 311, 263 Pac. 683.)

It follows that wherever there is a conflict in the evidence this court may only review the testimony for the purpose of determining whether or not there is any substantial evidence in the record to support the verdict of the jury, and must accept the evidence there found as true, unless that evidence is so inherently impossible or improbable as not to be entitled to belief; and, where a verdict is based upon substantial evidence which, from any point of view, could have been accepted by the jury as credible, it is binding upon this court, although it may appear inherently weak. (*Williams* v. *Thomas,* 58 Mont. 576, 194 Pac. 500.) Where the evidence is conflicting, but substantial evidence appears in the record to support the judgment, the judgment will not be disturbed on appeal, and this is especially true when the court, as here, has passed upon the sufficiency of the evidence on motion for a directed verdict and motion for a new trial and upheld its sufficiency. (*Bank of Commerce* v. *United States Fidelity & Guaranty Co.,* 58 Mont. 236, 194 Pac. 158.)

Considering, then, all of the evidence presented to the jury on behalf of the plaintiff as the facts on which the jury rendered its verdict, without detailing it at length, we have the picture of a strong-minded, keen-witted mother, wholly

wrapped up in her only child, fearful of being separated from him, and jealous of anyone seeming to come between them; as a young lady, previously engaged to Billy, said to defendant, "You are afraid someone will get your damned beautiful baby."

There is nothing in the record to show that defendant was in any way concerned in the breaking off of the first engagement of the young people, but the glee with which Billy received knowledge that Ella May was back in the state and willing to see him, and the haste with which he became re-engaged and married, indicate that he was not particularly prejudiced against her religion; the record clearly shows that defendant was strongly opposed to a union with a Catholic. True, defendant twice, within a short period of time, invited plaintiff to the ranch before the marriage, but it is to be noted that on the second occasion she absented herself so that plaintiff, feeling slighted and placed in an embarrassing position, refused to stay out her proposed visit, and within a few days after the marriage the defendant expressed the hope that Ella May would become drunk on cocktails served in her house "and teach Billy a lesson." The young couple was married without her consent, and, being informed by telephone that the ceremony was pending, and asked if they should come home first, she replied "No," and refused to attend. On leaving the 'phone, defendant executed a dance, and remarked that she could now leave the ranch. Asked as to the defendant showing pleasure at the news of the marriage, the witness telling of the matter replied, "Rather than acting delighted and gratified at the time she danced, Mrs. Wallace acted rather hysterical, but so far as I could judge from her appearance she was well pleased at the time; and if she became displeased at any time it was after she first heard of their marriage." This witness further testified that "before they were married she had said she would not live on the ranch with them." Almost immediately she stood before the picture of her deceased husband,

and, with tears in her eyes, cried, "They won't get any of our money, will they, Daddy?"

As the time for the arrival of the couple drew near, she then required the maid to coat her face with white powder and paint black circles under her eyes and to tell Billy when he returned that she had eaten nothing and cried all day. She referred to Ella May, in the presence of Billy and before the marriage, "as a dirty Irish Catholic," and made slighting remarks concerning her, indulging in shrugs, gestures, grimaces. On the arrival of the young couple, she told them that the marriage could not be successful owing to the difference in religion.

Although Billy was a full partner in the operation of the ranch, and consequently had equal rights with his mother in the house, the couple was accorded little privacy, even in their bedchamber. This partnership was ended three days after the marriage by the defendant, without giving Billy any voice in the matter, on the ground of his refusal to rise at 6:30 on Sunday morning; he was given $4,000 out of his investment of $18,000, and was thereafter told that he could work for his board and clothes. Defendant thereafter acquired property belonging to Billy at the time of the marriage, valued at many thousands of dollars, which, according to her testimony, Billy "gave" to her.

Within a few days after the marriage, she told the young husband that she was going to change her will and leave all her property to charity; that Catholic grandchildren should have none of her money; that she had given her whole life to him, and he should stay with her as long as she lived; that his marriage would be but temporary, and that he should choose between her and Ella May, or had chosen between the two; that he knew that she disapproved of Ella May, not on her own account, but on account of her religion. Billy cried; she cried. She told the plaintiff that Billy had married without her consent and she was not going to leave any of her money to him, that he had no business getting married while she lived, and that the marriage would not be

a success, and she told plaintiff, in the presence of Billy, that a party named had told her that Billy must have been drunk when he married her.

Much of the testimony was given by the hired girl, who admitted that she was discharged five days after the marriage for drunkenness; this witness was asked on cross-examination whether she knew of anything defendant did to influence Billy against plaintiff; she pertinently remarked, "The constant dripping of water will wear away a large stone," and answered, "I am positive she did influence him because of little insinuations she was always making against the Catholics."

Within a week after the wedding defendant made arrangements with a friend to go to a picture show, but, when the friend presumed to congratulate her on the marriage, she became so upset that the show had to be abandoned; she told her friend that it was not a subject for congratulation; that she had consulted a lawyer, but had been advised to keep still about her dislike for her daughter-in-law's religion. This witness expressed the opinion that "things right at that time looked like it would be very hard for everybody concerned." Defendant told the witness that she would leave no money to Catholic grandchildren.

Plaintiff early became pregnant, and, when this was made known to defendant, she told plaintiff, that, if she went through with it and had a child, it meant the breaking up of the union, and advised Billy, and through him the plaintiff, as to methods to be used to cause an abortion; plaintiff complied upon the theory that, if she could get rid of the child, she could retain her home and husband, but without success.

Defendant objected to the trip to Europe, and Ella May was willing to forego it, but Billy insisted, saying he would go alone if she did not go with him; they went, and during their travels plaintiff acquired a rosary from the Holy Land, and Billy bought her a Spanish shawl and fine linens. While they were together and absent from the defendant, Billy promised plaintiff that she should go to her mother in California for

her confinement; after their return, this plan was vetoed by Billy and his mother on the ground that she might be confined on the train, although this was some weeks before her confinement. As the time for plaintiff's confinement approached, defendant went with her to a hospital and made arrangements for her; this was about the 1st of July. Thereafter plaintiff remained in Missoula at a hotel, while defendant returned to the ranch with Billy. Relations between the husband and wife, and the wife and mother-in-law, seemed then to be all that could be expected, but by the time the baby was born on July 18, 1926, Billy had lost his affection for his wife; he was present at the time the baby was born, but did not return to the hospital thereafter until August 7, and he then came only at the urgency of plaintiff, although the 5th was their wedding anniversary. The baby had a malformed ear, and Billy seemed to lose interest in the child as soon as he saw it. Plaintiff told him she could not return to the ranch to raise the child under the domination of the defendant, at which he left the hospital, telling her that he would return to talk it over in the afternoon, but did not return. His excuse for not visiting her was that he was too busy, although he lived but a two-hour drive away, and had a car, and was not too busy to take a trip through the Yellowstone Park with his mother and friends.

Finally, in September, Billy wrote plaintiff requesting her to return to the ranch, sent her money for the trip, and directed the doctor to send her and the baby home with a nurse; he promised to meet her on the arrival of the train. She returned, but was met at the depot by a stranger and taken to the ranch, where she found Billy and a lawyer friend sitting on the porch; neither he nor the defendant greeted her or the baby; the house was so cold that the nurse would not permit plaintiff to take off her coat or to unwrap the baby, and, in her weakened condition and in a highly nervous state plaintiff was compelled to go to the yard for wood and build her own fire. After consultation between Billy, the lawyer, and the defendant, Billy forthwith returned the nurse to Missoula, although she had come with five changes of raiment, prepared to stay until the plaintiff should be able to care for her child.

Plaintiff had mailed bottles and food for the baby from Missoula; these had been returned to Missoula before her arrival, and she testified that, knowing defendant's handwriting, to the best of her knowledge and belief the return address was in that handwriting. That night Billy and the lawyer departed for Helena, and never thereafter returned to the ranch while Ella May was there, and within the month he commenced his divorce proceeding in Jefferson county, a jurisdiction foreign to the territory of their residence, and in which both were unknown, and during this period defendant talked over the 'phone with Billy on several occasions after he left the ranch and before the filing of the action for divorce, and therein assured him that everything was all right on the ranch and for him not to come back. However, defendant left the ranch for a few days during this period, leaving Ella May on the ranch, but it was then found that the telephone had been disconnected, so that plaintiff could neither communicate with Billy nor seek relief elsewhere, and the circumstances were such that the jury might well believe that the defendant herself had disconnected the 'phone for that purpose.

Plaintiff found that her trunk had been opened, her fine linens used and left in the laundry bag, dirty; her Spanish shawl had disappeared, and her cherished rosary given to the hired girl.

Defendant told plaintiff, "You know I never liked the Catholic faith and have never wanted Catholic grandchildren and now that the baby is defective you can't expect Billy or I to have anything to do with it." One Lindgren testified that he met defendant on her trip from the ranch in September, and that she told him that she was having family troubles over the son's marriage to a Catholic, that she was not going to leave her property to Catholic grandchildren, and that she mentioned the child as "deformed."

Plaintiff's father called at the ranch in September, after Billy had gone to Helena, and asked defendant what the trouble was. Her reply was that "Ella May is a Catholic and I don't believe they will ever make up"; she suggested that, if

the father would send Ella May to California, it might "blow over," but gave as her reason for the suggestion that she wanted Billy back on the ranch, and he would never come back while Ella May was there.

It is true that there is no direct evidence in the record to ▪ the effect that the defendant did actually alienate the affections of the husband; what was said by her to Billy on the subject is, of course, veiled in obscurity, except as to those matters related by Billy to his wife, hereinafter considered, but in cases of this character the evidence must of necessity be largely circumstantial. No one but the alienated spouse can state positively that the actions of the defendant influenced his conduct, and this, under the circumstances of such a case, he could not be expected to do. (*Moelleur* v. *Moelleur*, 55 Mont. 30, 173 Pac. 419.) The insidious practice calculated to alienate affection is like fraud which "conceals itself" and cannot be proved by direct evidence, "does not move on the surface in straight lines. It goes in devious ways. We may with difficulty know 'whence it cometh and whither it goeth.' * * * It is rarely that we can lay our hand upon it in its going. We are more likely to discover it at its destination, before we know that it has started upon its sinuous course. When we so discover it, the searchlight of a judicial investigation goes back over its trail and lightens it from beginning to end. As the woodman follows his game by slight indications, as a broken twig or a displaced pebble," it may "become apparent by innumerable circumstances, individually trivial, but in their mass 'confirmation strong as proofs of holy writ.' " (Quotations from *Merchants' National Bank* v. *Greenhood*, 16 Mont. 395, 41 Pac. 250, 259.)

As is said in *Nelson* v. *Nelson* (C. C. A.), 296 Fed. 369, 375: "We must not be unmindful of the fact that human experience of this kind, resulting in a broken home, results from an accumulation of efforts, stealthily carried on. This disintegrating work may be resorted to with many subterfuges. A plaintiff may not produce the strongest kind of evidence to make out a case. A sulky mood, an insolent look, a gloomy

manner, a constant derision and undermining of the affection of the one for the other with malice, will accomplish the result and will suffice in the necessity of legal proof. The fact that evidence is circumstantial does not impair its usefulness nor deprive it of potency."

We think the record discloses a course of conduct indulged and persisted in by the defendant from the moment she was notified of the imminent wedding down to the time of the final break between husband and wife, from which the jury might justifiably say that she was employing every means open to her to cause the breach, wean Billy from his wife, and insure his future sole allegiance to herself. Let us see, conceding this to be so, whether the evidence is sufficient to warrant a verdict in favor of the plaintiff.

A cause of action for the alienation of affections would seem to consist of three elements: The wrongful conduct of the defendant, plaintiff's loss of the affection or consortium of the other spouse, and a causal connection between such conduct and loss. (4 A. L. R. 505.)

The law does not require anything from parents-in-law, except that they do not meddle with the domestic felicity and affections of their son and his wife. The parents may hold aloof, refuse to recognize the wife, show no interest in her children, and cut the son off without a penny for marrying without their approval, and are not to be penalized for so doing, provided they are not guilty of some intentional acts which tend to alienate their son's affection for his wife, without good cause. (*Cooper* v. *Cooper*, 102 Kan. 378, 171 Pac. 5; *Woodhouse* v. *Woodhouse*, 99 Vt. 91, 130 Atl. 758.) If, however, the parent does not choose to stand aloof or advise the child that, because of his or her marriage, the parent is through with the burdens of parenthood, and instead sees fit to seek to hold the child to an allegiance to the parent, and to wean him, or her, from the spouse of whom the parent does not approve, the parent does so at his or her peril.

All that the defendant did or said, if accompanied by a refusal on her part to take the young people into her home,

might come within the above rule, but, when her acts and declarations were accompanied by a reception of the couple into the home, and the bending of every effort to keep the husband there, and then to impress upon him his duty to live with her as long as she should live, that his marital relationship could continue but a short time anyway, and to impose upon him a penalty for continuing that relationship, an entirely different situation is presented for the jury's consideration.

The marriage of a child does not terminate the right of the parents to interest themselves in the child's welfare or happiness; a parent may go so far as to cause a breach in the marital relations of the young couple for good cause and in good faith—as where the other spouse is guilty of ill treatment, drunkenness, immorality or wantonness (30 C. J. 1129, and cases cited); but in this land of religious liberty it can hardly be said that a difference of religion is sufficient cause for interference, after the young folks have married. It is said that the opinion in *Rice* v. *Rice*, 104 Mich. 371, 62 N. W. 833, is to the contrary, but that case goes no further than to hold that the father had a right to object to his son's marrying a Roman Catholic, and that he had a right to advise his son that he was unwise in living with his wife if she remained in the church, and that advice given after the son had separated from his wife would not afford a cause of action. But undoubtedly a parent who, from improper motives, induces a daughter to leave her husband, or a son to leave his wife, may be liable in damages for such tort, and it has been held that proof that a separation between husband and wife has been caused by the unwarranted interference of the former's parents, accompanied by threats to disinherit him, is sufficient to enable the wife to maintain an action against and to recover from them. (13 R. C. L. 1471; *Price* v. *Price*, 91 Iowa, 693, 51 Am. St. Rep. 360, 29 L. R. A. 150, 60 N. W. 202.)

But it is said that more proof is required to sustain such an action against a parent than against a stranger. Good

faith and a proper motive will exonerate the parent from lia-
bility, and, therefore, in an action against a parent, malice
must be shown. (*Moir* v. *Moir*, 181 Iowa, 1005, 165 N. W.
225; *Meek* v. *Meek*, 118 Kan. 106, 233 Pac. 1032; *Kadow* v.
*Kadow*, 195 Wis. 650, 219 N. W. 275; *Birchfield* v. *Birchfield*,
29 N. M. 19, 217 Pac. 616.) With this statement we agree,
and we also agree that, as affected by the motive of the de-
fendant, the cases against parents of the spouse whose affec-
tions were alleged to have been alienated are distinguished from
those against strangers; in such a case the plaintiff must show
that the defendant acted with malice toward the plaintiff
(*Bourne* v. *Bourne*, 43 Cal. App. 516, 185 Pac. 189; *Tucker* v.
*Tucker*, 74 Miss. 93, 32 L. R. A. 623, 19 South. 955; *Cooper*
v. *Cooper*, above); but this proof need not be direct—it may
be implied or deduced from the facts and circumstances re-
lated (*Hutcheson* v. *Peck*, 5 Johns. (N. Y.) 196; *Warren* v.
*Graham*, 174 Iowa, 162, 156 N. W. 323; *Moir* v. *Moir*, above;
*McAllister* v. *McAllister*, 72 Colo. 28, 209 Pac. 788; *Biggs* v.
*Biggs*, 78 Colo. 310, 241 Pac. 539), and the "malice" here
requisite need not spring from a mean, hateful, or revengeful
disposition, but may imply conduct injurious to another,
though proceeding from an ill-regulated mind not sufficiently
cautious before it occasions the injury. (*Roberts* v. *Cohen*,
104 Or. 177, 206 Pac. 293.)

It is not necessary that there should have been any spite or
hatred on the part of the defendant toward the plaintiff, or
bad feeling existing in order to constitute malice within the
meaning of the decisions on this question, but any wrongful
act done intentionally, tending to injure, and done without just
cause or excuse, is malicious. (*Westlake* v. *Westlake*, 34 Ohio
St. 621, 32 Am. Rep. 397; *Gee* v. *Culver*, 13 Or. 598, 11 Pac.
302; *Boland* v. *Stanley*, 88 Ark. 562, 129 Am. St. Rep. 114,
115 S. W. 163.)

In *Smith* v. *Smith*, 192 Mich. 566, 159 N. W. 349, it is de-
clared that, in such a case as this, malice is established when-
ever it is shown that the parent has interfered with a son's or
daughter's domestic relations simply to gratify the dislike or

hatred of such parent for the intruding spouse, and it is said: "In the instant case, if plaintiff's husband was induced to leave her and to withdraw his affections from her by the conduct or solicitations of defendants, purposely directed towards that end, then it must be held that they were actuated by malice."

So here, on the evidence, both direct and circumstantial, tending to show such interference by defendant in the marital relations of the young couple as to warrant the young husband in believing that he could never live in peace and harmony with both his wife and his mother, and the latter's insistence that he do remain with her, we think malice, within the meaning of the above authorities, was sufficiently shown, and that the evidence as a whole was sufficient to uphold the verdict and judgment.

2. Numerous specifications of error are made upon the admission of testimony given by plaintiff regarding statements made to her by her husband, in the absence of defendant, as to acts and declarations of defendant to him and direction as to what plaintiff's attitude toward the defendant should be. Many cases are cited to support defendant's position that this testimony was all hearsay and inadmissible for any purpose.

Much of this testimony is along the same lines as the showing of defendant's acts and declarations by admittedly competent evidence, and, even if improperly admitted, could not have prejudiced defendant's substantial rights. This testimony is to the effect that Billy told his wife that his mother had objected to his marrying a Catholic, to his being married by a priest, and to his signing the agreement that any children of the marriage should be raised in the Catholic faith, but further that plaintiff and defendant could never be friends, and plaintiff should not oppose defendant by arguing with her on any subject, as defendant would "get" her if she could. This testimony was only admitted for the limited purpose of showing Billy's mental condition or attitude at the time in consequence of his mother's attitude toward the wife, and at the time the testimony was admitted the court cau-

tioned the jury as to the purpose of its reception, and that they should not consider it as proof that defendant had made the statements or committed the acts recited, and later instructed the jury on the subject in part as follows: "Each and all of these were admitted, not as evidence of the truth of any such statement or alleged declarations, but they were admitted solely and only to prove and establish the mental attitude or state of mind of the said William Hibbs Wallace; such alleged declarations are not to be considered by you as even tending to prove or establish the truth of any of such statements or declarations themselves, or in anywise tending to establish or prove the guilt of the defendant, so far as such statements and declarations go." We must assume that the jury obeyed the instruction of the court.

The defendant requested the court to instruct the jury that ▮▮▮▮ "this evidence was not admissible for any purpose and should not be considered." In addition to predicating error upon the admission of the testimony, defendant contends that the court erred in giving the foregoing instruction and in refusing to give the offered instruction.

There is a diversity of authority on the admissibility of such testimony, but it arises mainly from the different methods in which it was sought to get the evidence before the jury and the limitations or want of limitations placed upon the purpose for which it was admitted in each case. The line of demarcation drawn by the authorities between those matters to be admitted and those to be excluded to show the state of mind and the reactions of the alienated spouse is left somewhat in a twilight zone, dependent upon the circumstances of each case. The general rule is that such evidence is hearsay and not admissible. This is the rule announced in *McGowan* v. *Armour*, 248 Fed. 676, 160 C. C. A. 576, relied upon by defendant, wherein the plaintiff in an alienation case was permitted to state what her husband had told her the defendant had said to him. Holding that error was committed, the court said: "In the main no attempt was made to lay a foundation for this hearsay evidence. It was not produced as expressive

of the husband's feeling, or as so intimately connected with any act of his as to be part of such act within the verbal act rule; on the contrary it was elicited as a mere narrative by the husband of a past conversation between him and defendant." The court then comments on the holding in *Hardwick* v. *Hardwick*, 130 Iowa, 230, 106 N. W. 639, wherein testimony by the wife to the effect that the husband had told her that his father wanted him to leave her was admissible, saying: "This, however, was given as explanatory of a violent outburst of love and weeping on the part of plaintiff's husband." The court also quotes from Wigmore on Evidence, section 1730, to the effect that an exception to the hearsay rule exists in alienation cases where the state of the affections of the husband or wife become material.

In an exhaustive note to *Melcher* v. *Melcher*, 102 Neb. 790, 169 N. W. 720, found in 4 A. L. R. 492, it is said: "In some jurisdictions, * * * the declarations of the spouse whose affections are claimed to have been alienated, are held admissible for a limited purpose, though they refer to defendant's acts or conduct." Under the heading "Declarations concerning acts or attitude of declarant's relatives or friends charged with alienating declarant's affections," many cases are given in this note wherein declarations of this nature were allowed to go into the record without qualification as to their purpose, and the rulings are held erroneous, while other cases are cited holding that such admission does not constitute error. Under the head of "Admission for limited purpose" the author of the note states the three elements of an action for alienation of affections as above: The wrongful act, the loss, and the causal connection, and then says: "Probably all courts would agree that the declarations of the alienated spouse concerning the acts and conduct of defendant are not admissible to prove the first of these elements, that is, defendant's guilt. The courts which hold such declarations admissible for any purpose usually lay stress on the fact that they are not admissible for the purpose of showing such guilt. * * * And probably all courts which hold such declarations admissible for any purpose would agree that they are admissible for the purpose of

proving the third element. That is, when defendant's misconduct has been shown, and it has also been shown that the husband and wife have separated or that plaintiff has lost the affections of the other spouse, such declarations are held admissible to show that the separation, or the loss of affection, was the effect of such misconduct, and not the effect of some other cause.'' A respectable line of authority is cited in support of this proposition. The author then says that: ''Some courts, however, seem to go beyond this, and hold that the declarations are admissible'' for other purposes enumerated, even to the extent of tending ''to prove the loss of affections * * * as well as the cause of such loss.''

As to the husband's cautionary remark to his wife that, owing to their differences on the question of religion and his mother's objection to the marriage, the two women could never be friends, and the wife should yield to the mother, not argue with her, as she would ''get'' her if she could, we think in such a case as this the evidence was admissible to show the young man's reaction to the attitude of his mother and his desire to hold the affection of his mother even at the discomfiture of his wife.

On the whole, limited as to purpose as it was, and but reflecting the attitude and the acts and declarations of the defendant as shown by competent evidence, both direct and from which the jury were entitled to draw the inference of active interference, we hold that no prejudicial error was committed either in admitting the evidence or in the giving of the quoted instruction and the refusal of the proposed instruction.

3. Defendant contends that prejudicial error was committed in permitting the witness Barrille to testify to defendant's alleged address to her husband's picture, as the alleged statement is said to have been made before the marriage, and was not communicated to either the husband or wife. We think the evidence was admissible as tending to show motive and malice, and so closely related to the acts and conduct of the defendant immediately thereafter as to constitute a part of the *res gestae.*

We have examined the remaining assignments of error argued, respecting the admission of evidence, and without further encumbering the record by recitation and citation, we find no reversible error in this respect.

4. Finally, it is contended that the verdict for $20,000 is excessive. It is urged that, with the question of support removed by the award of alimony in the divorce proceeding, and the jury instructed to that effect, the size of the verdict denotes passion and prejudice on the part of the jury.

In this class of actions there is no scale or yardstick by which the amount which will compensate for the loss suffered can be measured, and a wide latitude must be allowed for the exercise of judgment by the jury. In addition to support, a wife is entitled to the aid, protection, affection and society of her husband, and damages for the alienation of a husband's affection include, not only such compensation as the jury may deem just and proper, under the evidence, for the loss of these, but compensation for the humiliation and suffering inflicted upon the deserted wife. (Sutherland on Damages, 4th ed., sec. 1285.) In this respect, the verdict is in the nature of punishment, and a larger verdict is required to punish one of wealth than one not so fortunately situated. (*Audibert* v. *Michaud*, 119 Me. 295, 111 Atl. 305.)

Here it appears that the defendant is worth upward of a quarter of a million dollars; the verdict is for $20,000. Many cases have been called to our attention wherein verdicts as large, or in excess of, the present verdict have been sustained, although the defendants were in no better position to pay the judgment than is this defendant.

A new trial on the ground of the excessiveness of the verdict can be granted only when the verdict is so excessive as to evidence passion and prejudice on the part of the jury. (Sec. 9397, Rev. Codes 1921.) If we should reverse the judgment and remand the cause for a new trial on this ground alone, we would, in effect, substitute our judgment for that of the jurors and instruct a subsequent jury that it should render a verdict for a less amount, and how should we determine what

would be a reasonable amount under the circumstances? We might reduce the verdict, but on what facts found in the record could we say: So much would be reasonable, so much excessive? How are we to gauge the loss or suffering of the plaintiff for the loss of the affection and companionship of a wealthy and pleasure-loving husband and the assistance of a father in the case of an ailing child? These matters are best left solely to the sound judgment of the jury, and such a judgment should be set aside only when it is manifest that the verdict was rendered under the impetus of passion and prejudice. Here we cannot say that such a showing is made.

Slightly paraphrased, the remarks of the supreme court of Washington, made in the opinion in *Regenvetter* v. *Ball*, 131 Wash. 155, 229 Pac. 321, are peculiarly pertinent here: "The question of the amount of recovery is solely for the jury. The court may not substitute its judgment for the judgment of the jury, however much it may be dissatisfied with the verdict returned. Its power in this respect is limited to granting another trial, or * * * giving the plaintiff the option to accept a lesser sum * * * or submit to another trial. But there must be a limitation to the exercise of this power else it may result, because of the exhaustion of the plaintiff or her resources, in the denial of recovery at all. The tribunal the law appoints to measure the plaintiff's recovery has, in this instance, twice returned awards substantially in the same amount, and nothing in the record indicates that there would be a different result were the plaintiff to be compelled to resort to a third. It is our opinion that an injustice would be done plaintiff if compelled to resort to another trial, and that the judgment should be affirmed."

After a careful and exhaustive review of the record, we are of opinion that, if the judgment were reversed and the cause sent back for a new trial with all questioned evidence excluded, a third trial would result no different than did the two trials accorded these parties, and a reversal of the judgment would but lead to further litigation and expense.

For the reasons stated, the judgment is affirmed. Remittitur forthwith.

ASSOCIATE JUSTICES GALEN and FORD and HONORABLE O. F. GODDARD, District Judge, sitting in place of MR. JUSTICE ANGSTMAN, disqualified, concur.

HONORABLE B. E. BERG, District Judge, Sitting in Place of MR. CHIEF JUSTICE CALLAWAY, Disqualified: I dissent. I am unable to agree in the conclusions reached by the other members of this court as regards the sufficiency of the evidence to sustain the verdict, or upon the admission of certain evidence hereinafter discussed.

I am of the opinion that the statement of the evidence by the court in the main opinion is not sufficiently elaborate to disclose all the circumstances surrounding this tragedy. As far as possible, without repetition, these additional facts appear without dispute:

Plaintiff and defendant first met in Missoula in the spring of 1924; plaintiff and Billy then being engaged. Defendant was a patient at the Sisters' Hospital in Missoula, and she gave the plaintiff, who was a frequent visitor of the defendant, an appropriate graduating present. Defendant then knew of the plaintiff's religion.

The defendant's reference to Ella May as "a dirty Irish Catholic," her appearance before her deceased husband's picture, and stating, "They won't get any of our money, will they, Daddy," and her referring to Ella May that "any kid could arrange flowers as well," all occurred prior to the marriage.

The statements made by the defendant to the plaintiff or her husband and to witnesses Alaska Barrille and Mrs. Kelly to the effect that she did not approve of marriages between Catholics and Protestants, that she intended to leave her money to charity, and would not leave any of her property to Billy or Catholic grandchildren, were all made within a short period after the marriage.

As to the cocktails served, it appears from the plaintiff's witness Alaska Barrille as follows: "Mrs. Wallace tasted it and said it was too strong for girls to drink and she hoped Ella May would get drunk and teach Billy a lesson."

Plaintiff discovered she was pregnant about the 1st of November, and she states that she and Billy had been using safeties until Billy told her that his mother said they should not use safeties, and plaintiff says that Billy's mother bought a syringe and boracic acid, and told Billy how to use them. It appears that plaintiff took turpentine in capsules prepared by Billy and under instruction from Billy as to how to take them, the defendant in this instance having got the bottle of turpentine and set it on Billy's desk; that she later took borax in capsules prepared by the defendant, and, according to the plaintiff, these medicines were taken to produce an abortion, and defendant told her that Billy was much upset over the fact of her pregnancy, and "that we should not have any children, as it would cause trouble," and that plaintiff took the borax to save her home.

From the plaintiff's evidence and from uncontradicted evidence, it is established that, after the marriage, plaintiff and her husband attended many football games, week-end parties, the State Fair, had many guests at their own home, and in general had a good time. Defendant gave plaintiff money at various times and appropriate presents. On January 15 they left for a tour of Europe, sailing from New York January 26 and returning about April 28. Defendant opposed this trip because they could not afford it and because the plaintiff was pregnant. She helped plaintiff prepare for the trip, and during their absence bought some new furniture and new bedding for their use, and made other new bedding for them. Within a week after their return home from Europe, defendant left for a month's visit in Missouri, returning about May 29. While in New York and during the European tour plaintiff and defendant corresponded, and plaintiff's letters to defendant were written in endearing terms. The first one, from New York, written January 24, 1926, recites: "I was so blue

the morning we left and the day before that I just could not talk. I didn't even thank you for all the help you gave me. I do now, though, many times. This will be good bye and love to you from Uncle Sammy's land.'' Signed, ''Ella May.'' And again, in a letter by plaintiff to defendant, dated March 31, 1926, plaintiff says: ''Your letters have been so nice and you have no idea how glad we were to get them.'' And again: ''The food has been very good on the whole, many eggs and more chicken—but oh how good some Mother Wallace fried chicken would taste. Billy always adds, 'The biscuits, too,' when we talk about it.'' ''Now I will send birthday greetings again and much love. March is almost over and I hope that you are well and before long we will see you.'' Signed, ''Ella May.'' And again, April 12, 1926, from Paris, plaintiff sent defendant a postcard, in which she sends her love and says: ''We will soon be home.'' On board the Cunard steamship, February 12, plaintiff wrote defendant, closing with the following: ''Much love and I hope you are well and that everything is fine. Love.'' Signed, ''Ella May.'' All of the letters are addressed ''Dear Mother Wallace.''

Defendant made the arrangements with Dr. Thornton for plaintiff's confinement in the hospital, and arranged for the plaintiff to have the best of service. About the middle of June plaintiff's father visited the Wallace ranch, and the plaintiff at that time wanted to go to her mother in California for her confinement, but the defendant and Billy objected to this, for the reason that it would be too risky in her then condition, and defendant said plaintiff ought to be with her husband on the birth of the first child. During the month of June, the plaintiff and the defendant worked together in making baby clothes and other things in preparation for the expected child. Billy was present at the birth of the baby, and went to see the plaintiff twice on August 7, and then no more. During the confinement and plaintiff's stay in the hospital, plaintiff's mother was in attendance. On August 7 Billy asked plaintiff when she would be ready to come home, and plaintiff replied that she would not return to the ranch under the existing con-

ditions. She made up her mind not to return to the ranch about August 1. Defendant visited plaintiff at the hospital about three days after the birth of the child, and sent flowers to the plaintiff from the ranch on several occasions, but no more after plaintiff's mother requested her not to send any more flowers. Plaintiff did not return to the ranch until September 6. She arrived at the ranch in company with a nurse, Miss McNally, and they were met at the train by Lulu Hoephner, who drove them to the ranch. No special preparations had been made for her at the ranch, and no fire was in plaintiff's room, and the room was chilly. Plaintiff's husband did not greet her, other than to assist her in taking her luggage from the automobile, and the same evening he left for Helena, and remained away until September 28, on which date he filed an action for divorce. This action was pending when the present action was commenced.

The defendant, while her son was in Helena, entreated her friends and friends of both her son and plaintiff to intercede and prevent the divorce action. Only one of these, Attorney Scharnikow, interviewed Billy, and Billy declined to consider reconciliation and said, in effect, that he was going to bring suit against his wife, and that he would do it, no matter who objected, whether his mother, Scharnikow, or anyone else.

Plaintiff remained at the Wallace ranch until the latter part of September, 1926. Shortly before leaving, her father visited and talked with the defendant, who in substance said that "Ella May was a Catholic and she did not believe they would ever make up; that if he could arrange to send Ella May to California to her mother this thing might blow over, as I want Billy back and he never will come back to this ranch as long as Ella May is here." Acting on this suggestion, plaintiff's father went to Helena to see Billy, and did see him, but Billy refused to discuss the matter with him, and walked away from him.. The latter part of September plaintiff left the Wallace ranch with her father.

The will of the defendant, Martha Wallace was admitted in evidence bearing date August 18, 1924, wherein her son, Will-

iam Hibbs Wallace, with the exception of two money bequests of $2,500 each, was given her entire estate, and, in the event of his death prior to her decease, such estate should go to the lawful issue of her son, William Hibbs Wallace, which will was in effect at the date of this trial.

Alaska Barrille gave the only testimony of shrugs and grimaces made by the defendant, and this occurred on only one occasion, and the witness was the only person present.

The plaintiff's witness Miss McNally states that Billy told her the trouble between Ella May and himself was largely money matters, and that his wife thought he was made of money.

Billy testified that he did not love the plaintiff at the time she went to the hospital, nor when she returned to the ranch with the baby, and that he asked her to come home on account of the baby; that he did love the baby. He also testified that his mother went to him in Helena and tried to get him to come back to the ranch and drop the divorce action, but that he would not do it.

The following testimony was admitted over objection of the defendant, and error was assigned: "Q. What further did he say to you as to her being a friend of yours? A. He told me that his mother and I could never be friends; that now that I had married Billy there was no use of our trying to be friends; that she would get me if she could.

"Q. What did he say with reference to his mother's statement to him as to what you should do? A. Billy told me that I should not argue with his mother and that he would appreciate it if I didn't." These are assignments of error 7 and 8, and in the order above given.

It is also assigned as error that the court refused to give defendant's offered instruction D–10 and gave instruction No. 13. Offered instruction D–10 is as follows: "You are instructed that there has been admitted in evidence testimony by the plaintiff that William Hibbs Wallace made plaintiff certain statements concerning certain alleged acts and utterances of the defendant. This evidence was not admissible for any purpose and should not be considered."

Instruction No. 13 is as follows: "In this case, certain testimony of plaintiff concerning recitals of William Hibbs Wallace, the husband of the plaintiff, concerning the acts and utterances of the defendant, has been admitted in evidence. The court instructs you with reference to these acts and utterances, as recited and testified to by the plaintiff, as having been told to her by her husband, William Hibbs Wallace, that each and all of these were admitted, not as evidence of the truth of any such statements or alleged declarations, but they were admitted solely and only to prove and establish, if they do so tend to prove or establish, the mental attitude or state of mind of the said William Hibbs Wallace; such alleged declarations are not to be considered by you as even tending to prove or establish the truth of any of such statements or declarations themselves, or in anywise tending to establish or prove the guilt of the defendant, so far as such statements and declarations go."

By the weight of authority such evidence is inadmissible for any purpose. (*McGowan* v. *Armour*, 248 Fed. 676, 160 C. C. A. 576; *Cochrane* v. *Cochrane*, 196 N. Y. 86, 17 Ann. Cas. 782, 24 L. R. A. (n. s.) 160, 89 N. E. 470; *Huling* v. *Huling*, 32 Ill. App. 519; *McVey* v. *Blair*, 7 Ind. 590; *Preston* v. *Bowers*, 13 Ohio St. 1, 82 Am. Dec. 430; *Brison* v. *McKellop*, 41 Okl. 374, 138 Pac. 154; *Jameson* v. *Tully*, 178 Cal. 380, 173 Pac. 577.)

One of the leading cases on this question, and a case frequently cited by the courts, is *McGowan* v. *Armour*, supra, and relied upon by the appellant in this case. There the court said: "Mr. Armour's statements, indicative of his own feelings, could be testified to by any person who heard him make such statements. It is also true that any statements made by defendant indicative of her feelings towards Mr. Armour might be given in evidence by any person who heard her make such statements. The vice of the evidence which was received in the present case is that plaintiff, who was testifying, did not hear the defendant make the statements. The statements were made to her husband. Her husband, however, was not a witness. He never told the court under oath, and subject to

cross-examination, what the defendant's statements were to him. On the contrary, defendant's statements were all run through one more conduit, namely, the plaintiff. She was permitted to tell what her husband told her that defendant had said to him. It is entirely plain that this went beyond any permissible rule. Anybody who heard Mrs. McGowan make statements expressive of her affections for Mr. Armour could testify as a witness before the court to those statements. That, however, is as far as the hearsay rule has been relaxed in such cases. The vice of the evidence received by the trial court is that it passed through one more messenger, and that messenger was passion * * * to distort the hearsay statements which she claimed to report. In the quest for Mr. Armour's feelings, he was converted into a general agent of the defendant to make the most damaging admissions on her behalf. To permit that was to lose sight of substantial justice in the pursuit of a dangerous and purely incidental matter. To say that the vice of this practice can be cured by admonitions to the jury as to the restricted purpose for which the evidence is received is to indulge a purely academic view of the lay mind. The verdict that was rendered in the present case is the best proof of the fallacy of such confidence."

In admitting testimony of this kind, the utterance must be the spontaneous and natural manifestation of the then existing emotion which inspired and produced it. As it was said in the case of *Pugsley* v. *Smyth*, 98 Or. 463, 194 Pac. 691: "It may be that in a given conversation between the husband and his deserted wife, she may make many declarations; and while some of these declarations may be natural expressions of emotions, yet the others may be pure narratives of acts done and words spoken, and hence not admissible."

In the present case the declarations made by the husband were not accompanied by any emotional act or utterance of the husband to occasion the declarations or for which the declarations offered any explanation, and the declarations were wholly narrative.

Moreover, the evidence set forth in specification of error No. 7 is a conclusion of the witness and an assertion by the wit-

ness of a threat made by the defendant to "get the plaintiff, if she could," whereas the record is wholly silent as to any such fact. This assertion imports direct malice of the defendant toward the plaintiff. It could not bind the defendant, and its admission was necessarily highly prejudicial to the defendant. The evidence objected to in assignment of error No. 8 is the instruction of the husband to plaintiff, of which the defendant knew nothing, could in nowise be binding upon her, and its only effect would be prejudicial to the defendant's rights. I am of the opinion that the admission of this evidence was reversible error, and that the instruction No. 13 should have been refused and the defendant's offered instruction No. D-10 given.

By specification of error No. 16, defendant asserts the court erred in permitting the plaintiff to testify that the reason why she asked certain persons who were at the Wallace home to look after the baby was because she was afraid to leave the baby alone with the defendant.

It was also, in my opinion, error for the court to permit the introduction of this testimony. Such evidence was merely a conclusion of the plaintiff, inferring that the defendant was so prejudiced against the baby that she would injure it, and was calculated to influence, inflame and prejudice the jury against the defendant.

It is also assigned as error that the court admitted evidence showing defendant's participation in the attempted abortion. Opposite conclusions have been reached by the courts on admission of this class of testimony. In the case of *Biggs* v. *Biggs*, 78 Colo. 310, 241 Pac. 539, and in the case of *Raleigh* v. *Raleigh* (Mo. Sup.), 5 S. W. (2d) 689, all such testimony is held admissible on the theory that the birth of a child would have a tendency to keep the husband and wife together; on the other hand, the supreme court of Oregon, in the case of *Schneider* v. *Tapfer*, 92 Or. 520, 180 Pac. 107, concludes that such testimony did not in any way tend to show the state of mind of the plaintiff in leaving the husband. The evidence in that case was hearsay, but the court, on its relevancy, said: "It was simply evidence which tended to debase and degrade the de-

fendant, by causing the jury to believe he had approved of his daughter's criminal abortion. Evidence could hardly have been offered which was more irrelevant to the issues involved in this case, and certainly none could have been offered which was more likely to inflame and prejudice the minds of the jury against the defendant. It was utterly incompetent to prove that the defendant had approved the abortion by such hearsay testimony; and even if he did approve it, it was no such an action as had any natural tendency to alienate the wife's affections.''

The theory of the plaintiff in the case at bar in offering this testimony and the reason assigned by the plaintiff for the attempted abortion was for the purpose of keeping peace in the family and avoiding any possible friction between her and her husband that might arise over raising their children Catholics.

It further appears that neither the plaintiff nor her husband were desirous of having children, and that they were using contraceptive methods without any suggestion from the defendant prior to the conception. The plaintiff, her husband, and the defendant co-operated in the attempted abortion, and the attempt was unsuccessful. The evidence, therefore, does not show, or tend to show, that it was for the purpose of alienating Billy's affections, and hence the reason for admitting such evidence, as given in the case of *Biggs* v. *Biggs,* and *Raleigh* v. *Raleigh,* supra, is absent. The fact that the court permitted this evidence to be introduced showing this defendant guilty of a crime punishable under the laws of this state which, as I view it, could not support the plaintiff's case, could only prejudice defendant's standing before the jury.

In my opinion, the evidence is wholly insufficient to sustain the verdict. The law is well settled that, in cases brought against parents of the spouse whose affections have been alienated, the burden is heavier and the degree of proof required is stronger than in ordinary actions, or in actions of this character against a stranger. It is incumbent upon the plaintiff to prove by a preponderance of competent evidence (a) that

the defendant was the controlling cause of such alienation, (b) that the acts of the defendant were intended by her to cause such alienation, and (c) that the defendant acted from improper motives and with malice toward the plaintiff. (*Hutcheson* v. *Peck,* 5 Johns. (N. Y.) 196; *Meek* v. *Meek,* 118 Kan. 106, 233 Pac. 1032; *Cooper* v. *Cooper,* 102 Kan. 378, 171 Pac. 5; *Kadow* v. *Kadow,* 195 Wis. 650, 219 N. W. 275; *Moir* v. *Moir,* 181 Iowa, 1005, 165 N. W. 225; *Bourne* v. *Bourne,* 43 Cal. App. 516, 185 Pac. 489; *Tucker* v. *Tucker,* 74 Miss. 93, 32 L. R. A. 623, 19 South. 955; *Brison* v. *McKellop,* supra.)

The earliest case involving this question is *Hutcheson* v. *Peck,* supra, wherein Chief Justice Kent of the supreme court of New York said: "If the defendant did not stand in the relation of father to the" plaintiff "I should not, perhaps, be inclined to interfere with the verdict. But that relationship gives the case a new and peculiar interest; this is the first action of the kind I have met with, brought against the father. A father's house is always open to his children; and, whether they be married or unmarried, it is still to them a refuge from evil, and a consolation in distress. Natural affection establishes and consecrates this asylum. The father is under even a legal obligation to maintain his children and grandchildren, if he be competent, and they unable to maintain themselves; and according to Lord Coke, it is 'Nature's profession to assist, maintain and console the child.' I should require, therefore, more proof to sustain the action against the father, than against a stranger. It ought to appear either that he detains the wife against her will, or that he entices her away from her husband, from improper motives. Bad or unworthy motives cannot be presumed. They ought to be positively shown, or necessarily deduced from the facts and circumstances detailed. This principle appears to me to preserve, in due dependence upon each other, and to maintain in harmony, the equally strong and sacred interests of the parent and the husband."

In the case of *Rice* v. *Rice,* 104 Mich. 371, 62 N. W. 833, the court approved the following instruction, and held the same to be within the rule of *Hutcheson* v. *Peck,* supra: "The court instructed the jury that it was not the duty of the defendant to advise his son not to separate from his wife; that if the husband had made up his mind to leave her if she rejoined the Church, and, finding that she had done so, set about leaving her, and the defendant, while he was so doing, advised him that he thought it was best to do so before they had children, there was no liability; that they must find that her husband separated from her because the defendant alienated his affections; that he had the right to object to his son's marrying a Roman Catholic; that he had the right to advise his son that it would be unwise for him to live with her if she again joined the Church; that any advice he might give his son after the separation would not afford a cause of action."

In the case of *Kadow* v. *Kadow,* supra, the court said: "One spouse, who seeks to recover damages of the parents of the other spouse for the alienation of the affections of that other spouse, has the burden of establishing two facts: (1) That the acts and advice of the parents were the controlling cause of the separation and of the loss of affections. (2) That such acts were the result of malice or bad intent on the part of the parents toward the spouse claiming damages. (*McLery* v. *McLery,* 186 Wis. 137, 142, 202 N. W. 156.)"

It is the general rule that an order denying a new trial upon the ground that the evidence is insufficient to maintain the verdict will not be reversed, where the evidence is conflicting, but this court has also declared that the jurors may not act arbitrarily, and that there must be a real conflict in the evidence, and that the supporting evidence must be substantial.

In the case of *Haddox* v. *Northern Pacific Ry. Co.,* 43 Mont. 8, 113 Pac. 1119, our supreme court uses the following language: "Juries may not arbitrarily and capriciously disregard testimony of witnesses, not only unimpeached in any of the usual modes known to the law, but supported by all the circumstances in the case." This case was affirmed and cited

in the case of *Casey* v. *Northern Pac. Ry. Co.*, 60 Mont. 56, 198 Pac. 141, wherein the court, after quoting from the *Haddox Case*, said: "It is the general rule that an order denying a new trial upon the ground that the evidence is insufficient to sustain the verdict will not be reversed where the evidence is conflicting, if there is some evidence to support the verdict; but the rule has its foundation in the assumption that the conflict is real and the supporting evidence is substantial."

And in *Olsen* v. *Montana Ore Purchasing Co.*, 35 Mont. 400, at page 411, 89 Pac. 731, 734, the court says: "Jurors are not allowed to return verdicts based upon suspicions, conjectures, or probabilities, however strong and convincing they may be. There must be some substantive, concrete evidence to justify the judgment of a court." (*Shaw* v. *New Year Gold Mines Co.*, 31 Mont. 138, 77 Pac. 515.)

In the cases cited by the respondent to sustain her contention that the evidence is sufficient to sustain the verdict, that of *Nelson* v. *Nelson* (C. C. A.), 296 Fed. 369, probably contained the weakest evidence. But in that case there was a direct threat made by the mother-in-law, accompanied by much other evidence, that, unless he did as she said, she would give all her money to his brother, and the mother-in-law directed that the wife must go home, and said, if the son did not send her home, they would disinherit him, and their money would go to another brother.

In the case of *Biggs* v. *Biggs*, 78 Colo. 310, 241 Pac. 539, relied upon by respondent, defendant told his son that, if he did not get rid of that woman, he would cut him off without a cent.

In those cases, and in all of the cases sustaining a verdict against a parent for the alienation of their child's affection, there has been some direct interference upon the part of the parent directed to their separation.

In the case of *Hall* v. *Hall*, 174 Cal. 718, 164 Pac. 390, the defendant suggested to the husband and the wife that they were not mated, and he said he considered it his duty to separate the two people who were not mated. He offered the

plaintiff $1,000 to leave her husband, but the court held this evidence was insufficient to sustain the verdict against the parent. Similar conclusions have been reached in the following cases, holding the evidence insufficient to sustain the verdict: *Meek* v. *Meek,* supra; *Bourne* v. *Bourne,* supra; *Birchfield* v. *Birchfield,* 29 N. M. 19, 217 Pac. 616; *Kadow* v. *Kadow,* supra; *Ward* v. *Ward,* 102 Okl. 24, 225 Pac. 964; *Spiry* v. *Spiry,* 47 S. D. 500, 199 N. W. 778; *Moir* v. *Moir,* 181 Iowa, 1005, 165 N. W. 221; *Wohlfort* v. *Wohlfort,* 125 Kan. 234, 263 Pac. 1062.

The evidence is far from meeting the requirements of the law in this class of cases. There is no evidence that the defendant at any time suggested to either the plaintiff, her husband, or to anyone else that the plaintiff and her husband should separate or ought to separate. It appears that the plaintiff and her husband quarreled a great deal; that these quarrels existed prior to sailing for Europe; that they were persisted in during the tour of Europe, and became worse after their return from Europe. There is no evidence that the defendant incited or took any part in these quarrels. Certainly the defendant had nothing to do with any of their troubles while they were in Europe, and, indeed, the correspondence indicates a very cordial relation between the plaintiff and the defendant during this period of time, and this is highly significant upon the question of malice on the part of the defendant.

Even if it might be argued that the sentiments and expressions of the defendant, most of which were made shortly after the marriage, were directed to effect the alienation of her son's affections, her efforts were a signal failure. Certainly they had no effect upon the son, so far as the evidence is concerned at the time they left for Europe on January 15, 1926. From January 15, 1926, and until about June 1 of the same year, with the exception of a few days immediately following the married couple's return from Europe, defendant was not even with the plaintiff and her husband, and there is no evidence that this defendant did anything between January 15 and until the plaintiff returned from the hospital in September, 1926, that

could be construed as an attempt to alienate her son's affection. True, the defendant and her son were alone together from the time the plaintiff went to the hospital until she returned in September, but the opportunity to alienate his affections is not proof that the defendant did alienate them. (*Meek* v. *Meek*, supra.) And from the record in the case it appears that, prior to the time plaintiff returned from the hospital, the relations between the plaintiff and her husband were beyond reconciliation.

It further appears from the plaintiff's witnesses and from uncontradicted testimony of the defendant's witnesses that the defendant in this case treated the plaintiff kindly. After the decision of Billy to commence a divorce action, she did what she could to reconcile the plaintiff and her husband.

Nor does the evidence show that the defendant dominated Billy. On the contrary, Billy seems to have done as he wanted to. This is illustrated by his having bought an automobile, having taken the European trip against defendant's will, and, as the plaintiff says, married without the defendant's consent, and that he defeated whatever efforts his mother made to effect a reconciliation.

It is also noted that the able judge who tried this case in the lower court was denied the privilege of passing upon the motion for a new trial.

I am of the opinion, therefore, that there is no evidence in the case from which the jury could properly find that the defendant acted with malice, that she was the controlling influence affecting the alienation of her son's affections for the plaintiff, or that there is any evidence from which they could find that the acts and utterances of the defendant were directed to effect a separation between the plaintiff and her husband, and in my opinion the judgment ought to be reversed, with directions to dismiss the action.