WISTAR et al. v. WHITEWING et al.
(two cases).

Nos. 29569, 29570.   May 27, 1941.

Rehearing Denied July 8, 1941.

Application for Leave to File Second
Petition for Rehearing Denied
Sept. 9, 1941.

*116 P. 2d 565.*

Chas. R. Gray, W. N. Palmer, R. A. Barney, John W. Tillman, and Fred Tillman, all of Pawhuska, and T. F. Dukes, of Hominy, for plaintiffs in error.

Henry R. Duncan, of Tulsa, L. M. Colville, of Pawhuska, and Kelly Brown, of Muskogee, for defendants in error.

DAVISON, J.   The issues presented in the above-styled and numbered appeals concern a controversy over the right asserted by and on behalf of Katie Lee Whitewing, the wife, and Oscar Whitewing, Jr., the asserted child, of Oscar Whitewing, a full-blood Osage Indian, now deceased, to inherit the whole of the latter's estate to the exclusion of five other individuals who were finally determined to be brothers and sisters of said decedent. It being unnecessary herein to designate the latter by proper names, they will be referred to in our preliminary discussion of the trial proceedings as "brothers and sisters."

Oscar Whitewing died intestate on November 8, 1937, leaving an estate of substantial value. Thereafter, on November 12, 1937, his wife, Katie Lee Whitewing (hereinafter frequently referred to as "Katie Lee") instituted probate proceedings relative to said estate by filing in the county court of Osage county her petition for the appointment of one Paul Comstock as administrator thereof. Thereafter, in the course of said probate proceedings, the county court proceeded with a determination of the decedent's heirship.

After receiving evidence offered on behalf of all of the respective parties in support of their claims, the county court entered a decree determining that Katie Lee Whitewing was entitled to inherit one-half of the estate of the decedent; that Oscar Whitewing, Jr., was not the child of the deceased, and that the parties referred to herein as brothers and sisters of the deceased were entitled to the remaining one-half of said estate. From said decree the cause was appealed to the district court, where it was tried de novo as cause No. 17024 in said court.

To the petition which Katie Lee Whitewing filed in the probate proceedings for the determination of herself and Oscar Whitewing, Jr., to be the sole and only heirs of the deceased, she attached a decree entered by the district court of Osage county in a separate maintenance and support action filed by her against Oscar Whitewing in which Paul Comstock represented her as her attorney. Said decree was rendered on January 7, 1936, and contained a finding that Oscar Whitewing, Jr., was born of the marriage between the parties to said action, and therein plaintiff was awarded an allowance for the support of said child. Katie Lee Whitewing having pleaded said finding and decree in her petition for the determination of her deceased husband's heirship as a judicial determination that Oscar Whitewing, Jr., was a child of the deceased, the brothers and sisters who, as hereinbefore related, successfully opposed such a determination in the county court, thereafter, on January 4, 1939, commenced proceedings in the district court to vacate and set aside said decree. When said action (being docketed as cause No. 17013 in the district court) was ready for trial, said cause and the appellate proceedings attacking the county court's decree determining Oscar Whitewing's heirship, hereinbefore described, were tried together and upon the same evidence by the district court of Osage county. At the close of the trial, however, said court entered separate judgments in the two actions. By the judgment entered in its cause No. 17013

said court refused to vacate its former decree of separate maintenance and support, as prayed for by the brothers and sisters. In the judgment rendered in cause No. 17024 of said court, Oscar Whitewing, Jr., and Katie Lee Whitewing were determined to be the sole and only heirs of Oscar Whitewing, deceased, and as such entitled to inherit said decedent's entire estate in equal proportions.

From both of the above-described judgments, appeals to this court have been perfected by and on behalf of the brothers and sisters of Oscar Whitewing, deceased, said parties appearing as plaintiffs in error either in their own names or by next friend. The issues presented in the two appellate causes have been submitted in the same briefs and said causes treated as consolidated for the purpose of a decision by this court. Both Oscar Whitewing, Jr., and Katie Lee Whitewing will be included in the term "appellees" as hereinafter used. Correspondingly, the appealing parties will be referred to as appellants when not designated by proper names.

Most of the argument advanced by the appellants to demonstrate error in the judgments of the trial court in the two causes concerns the alleged insufficiency of the evidence to support said court's determination that the appellees are heirs of the decedent, Oscar Whitewing. They first challenge said adjudication with reference to the purported son of said deceased on the ground that the evidence is insufficient to prove that Katie Lee Whitewing gave birth to him.

One of the errors said to have been committed by the trial court is its alleged consideration upon the above-mentioned issue, of the finding contained in its previous decree of separate maintenance and support, hereinbefore described, to the effect that Oscar Whitewing, Jr., was born of the marriage between Oscar Whitewing and Katie Lee, whose maiden name was Fritz. Although said decree, as hereinbefore mentioned, was attached to and incorporated in the petition which the said Katie Lee Whitewing filed in the county court for the de-

termination of her deceased husband's heirship and remained a part of her pleadings when the probate cause was appealed to the district court (which we refer to herein as the trial court) and was introduced into the evidence admitted in said court, it cannot be said, as alleged by the appellants, that the judgment of the latter court was to any extent based upon or influenced by the finding or conclusion therein set forth with reference to the birth of Oscar Whitewing, Jr., in view of the expression from the trial judge himself on the matter. The record shows that at the close of the trial and during the course of said judge's pronouncement of the judgments herein appealed from, the following colloquy between him and one of the counsel for the brothers and sisters occurred in open court:

"Mr. Gray: Does Your Honor hold that the judgment in the separate maintenance case is conclusive or controlling in your finding in the heirship case? The Court: No, I think it is merely incidental to the issuance of the order. I do not think that that makes any difference now. Mr. Gray: It might make some difference in the event of an appeal. The Court: I think the order finding that was just incidental to the case and was not founded upon a necessarily full and complete presentation of those facts to the court. I think it is purely incidental, but if you want to show that in the record, the court finds that the finding of the court was merely incidental to carry out the object of the suit."

In view of the fact that both of the actions involved herein were tried by the court, without a jury, and in view of the record showing above described concerning said court's attitude toward the evidence complained of, we are not convinced that the trial court gave it any weight or consideration whatsoever in arriving at his decision. As it thus fails to appear that the admission of the separate maintenance and support decree into the evidence introduced in the present actions in any way prejudiced the rights of the appellants, we are impelled to conclude that the error, if any, in such admission was harmless.

In the remainder of appellants' argument concerning the alleged birth of Oscar Whitewing, Jr., it is sought to show that the evidence introduced to establish such birth is unworthy of belief in view of the circumstances surrounding it and the evidence to the contrary. At the trial they attempted to show that Katie Lee's pregnancy and the purported birth to her of Oscar Whitewing, Jr., was "faked." Their theory was that the child had been procured from some other source by Katie Lee's mother, Mrs. Beulah Davenport.

A transcript of the evidence introduced on behalf of the two groups of asserted heirs in support of their diverse theories concerning the child's origin comprises a substantial portion of the case-mades filed in these appeals. Each contains more than twenty-eight hundred (2,800) pages. It is therefore impractical to set forth in this opinion anything comparable to a detailed review or complete summary of said evidence. The most that can be done is to describe enough of it to form a brief background for a discussion of the material issues presented.

Oscar Whitewing and Katie Lee Fritz were married December 31, 1934, lived together in Hominy, Okla., for several months thereafter, and were then separated. After said separation Katie Lee lived with her mother, Mrs. Davenport, in a residence of a settlement referred to in the testimony as "the Indian Village," situated in or near Hominy. It was in this residence, according to the version presented on behalf of the appellees, that Oscar Whitewing, Jr., was born to Katie Lee on December 22, 1935. Just two days before Mrs. Davenport had left her daughter at home in Hominy and had driven to Tulsa. Between 4 and 5 o'clock, the afternoon of the 22nd, she telephoned Katie Lee from Tulsa, and afterward drove back to Hominy, arriving home about dusk to find her daughter in bed suffering severe pains. She attempted by telephone to summon Doctors Gayman and Walker of Hominy to attend Katie Lee, but was unable to contact either of them. Having had nursing experience,

and, according to her testimony, assisted in the delivery of babies on previous occasions, Mrs. Davenport then made certain preparations, unnecessary here to describe, for a childbirth there in the bedroom that she and Katie Lee had been occupying. Thereafter, according to the testimony of the two women, Oscar Whitewing, Jr., was born at 7:40 p. m., in said room with no attendants except Mrs. Davenport.

The appellants contend that the above version of Oscar Whitewing, Jr.,'s birth is rendered improbable and incredible by other circumstances proven and testimony introduced at the trial. Their argument proceeds upon the theory that such evidence tends to show that said baby was not born to Katie Lee, but was procured from some unknown source by Mrs. Davenport and brought home to Katie Lee by her on December 22nd, when she drove there from Tulsa. One of the facts called to our attention in support of this argument is that previous to said date Mrs. Davenport had instituted a search for a baby for adoption. Another is that Mrs. Davenport went to Tulsa so shortly before Oscar Whitewing, Jr., was supposed to be born. Another is that after receiving the long distance telephone call from her mother, Katie Lee sent her cousin away from the house where she and her mother were residing. Another is that Dr. Gayman, whom Katie Lee summoned after she had received the call and her pains had commenced, did not stay to deliver the child, but left Katie Lee before the alleged birth and went on an emergency call. These and other circumstances are discussed at length in the appellants' briefs and numerous inferences drawn therefrom, a detailed description of which would unnecessarily lengthen this opinion and serve no useful purpose. It is sufficient to say that we have examined all of such evidence, analyzed the argument with reference thereto, and are unable to say that the version of Oscar Whitewing, Jr.,'s birth described in the testimony of Mrs. Davenport and Katie Lee Whitewing and supported in many particulars by the testimony of other witnesses, is thereby rendered incredible and unworthy of belief. The only evidence introduced by the appellants which conflicts with the testimony showing that Mrs. Davenport's mission in leaving her home on December 20, 1935, was to visit friends and have a Tulsa dentist extract two teeth was the deposition of Dr. Gayman, who stated that Katie Lee told him when he called upon her that day that her mother "had gone to Eastern Oklahoma to get a baby." In view of the unequivocal evidence contrary to this statement and Dr. Gayman's testimony as a whole, as well as his interest and activities in the controversy, and other matters which the trial judge was warranted in considering, we cannot say that he erred in rendering a judgment in conformity with the evidence introduced on behalf of the appellees regarding Mrs. Davenport's absence from and return to her home just preceding the appearance there of Oscar Whitewing, Jr.

The appellants also attempted to prove by the testimony of Dr. Gayman and other witnesses that Katie Lee was not pregnant previous to December 22nd. The doctor's deposition contains the statement that he was told she was wearing pads to simulate pregnancy, and other witnesses testified as to having seen Katie Lee at times previous to December 22nd when she did not appear to be pregnant. In refutation of this testimony, however, the appellees presented a great many witnesses, some of whom had seen Katie Lee in various stages of undress during the period she claims to have been pregnant, and their testimony was to the effect that she was not padded but had the appearance of being genuinely pregnant.

The appellants also point to the testimony of certain physicians who examined Katie Lee Whitewing after the institution of the present litigation, and, as showing that she had never given birth to a child, they rely particularly upon the testimony of three doctors who examined her during the heirship proceedings in the county court at the instance and request of said court, and

testified in both the original trial there and the trial de novo in the district court. These physicians testified that they found in Katie Lee no trace of several physical characteristics which they said most women who had borne children possessed, and upon this basis stated that in their opinion Katie Lee had not borne a child. It would serve no useful purpose to describe this testimony in detail. It concerned technical matters about which men skilled in medical science might honestly disagree and conflicted in several respects with the testimony and depositions of seven physicians introduced by the appellees, all of whom had either examined Katie Lee or observed her examination, and whose testimony supported in varying degrees the appellee's contention that she had given birth to a child. After an examination of the medical testimony as a whole, we cannot say that it contains any substantial basis for the assertion that the trial court's judgment is clearly against the weight of the evidence.

The appellants also call our attention to "happenings" which occurred after the appearance of Oscar Whitewing, Jr., to demonstrate that Katie Lee was not his mother. One of these was that Mrs. Davenport was found by one of the witnesses to be sleeping in the same bed with Katie Lee and the baby a few hours after he was born; that Katie Lee did not treat her breasts in the manner which the physicians who testified on the point said they should have been treated; that she arose from her bed on the sixth day after the purported birth and traveled in an automobile with the baby to the home of Mr. and Mrs. John Wickliff, who were full-blood Indians living near Salina, and left the child there in their care in a house without modern conveniences while she came back to Hominy and stayed several weeks; and that when the petition for the appointment of Paul Comstock as administrator for the estate of Oscar Whitewing, deceased, was originally filed, it contained no mention ·of Oscar Whitewing, Jr. It is said that the evi-dence establishing these circumstances, and others which appellants apparently considered of less importance and were not seriously urged, supports their contention on the hypothesis that they would not have occurred had Katie Lee been Oscar Whitewing, Jr.,'s true mother. The gist of their argument is that a normal mother would not have acted in such a manner. Granting this to be true, we do not think the judgment of the trial court should be held erroneous upon that basis. We agree with counsel for the appellants that the record in these cases contains evidence of many circumstances, conduct, etc., which do not usually precede or follow the ordinary childbirth. Many of such facts do not comport with what would be reasonably expected of most human beings under ordinary circumstances, but most of them, we think, are sufficiently explained in other evidence not referred to by counsel for the appellants. For instance, an explanation of Katie Lee's early removal of Oscar Whitewing, Jr., to the home of Mr. and Mrs. John Wickliff is to be found in the undisputed fact that at that time Oscar Whitewing was contesting the separate maintenance and support action Katie Lee had filed against him, and the testimony of Mrs. Davenport who transported Katie Lee and the baby to the Wickliff home in her automobile. She testified that this was done because Oscar (Senior) had come to the house where they lived and threatened to take the baby away from Katie Lee "if she didn't go back to him," and that the old man who owned and lived in said house was complaining about the presence of Katie Lee and the baby there. Mrs. Davenport also testified that she placed pillows in the car, put "covers" around Katie Lee to hold her steady, placed the baby on a pillow and laid it on her lap. Katie Lee's return to Osage county and absence from the baby during much of the time he was at Wickliff's home is accounted for by the fact that during this time there were matters concerning her separate maintenance and support action that

required her presence in and around Hominy and Pawhuska, and the further fact that she became ill with influenza before she could return to the baby.

Nor can we see that the absence of Oscar Whitewing, Jr.,'s name from the application for the appointment of Paul Comstock as administrator of the estate of Oscar Whitewing, deceased, as originally filed or the testimony relied upon by appellants establishes the proposition they have formulated as follows: "The failure of Katie Lee and her mother to at first advance the child as an heir constitutes an admission that it was not such." The testimony mentioned was given by one of the attorneys who now represent the appellants, and whose employment by Katie Lee was solicited by Dr. Gayman before the beginning of the heirship proceedings. It concerned a conversation between the witness, Dr. Gayman, and Mrs. Davenport about the advisability of attempting to obtain a share of the decedent's estate for Oscar Whitewing, Jr., as one of the heirs. We have examined said testimony, but fail to find therein any proof which directly refutes the evidence of the appellees as to the paternity of Oscar Whitewing, Jr. The absence of his name from the application for the appointment of an administrator was explained by Paul Comstock, who drew it, as his own omission. Appellants say it is strange that Comstock, having represented Katie Lee in her separate maintenance action wherein he obtained support money for the child, and knowing of said child's existence, would neglect to insert his name in the aforementioned application. In this we agree, but this circumstance cannot be regarded as proof that Oscar Whitewing, Jr., is not the son of the deceased, especially in view of Comstock's testimony that the omission was merely the result of negligence and inadvertence on his part.

The appellants close their argument concerning the foregoing matters with the conclusion that "the unexplained circumstances are so strong that they greatly outweigh" the evidence supporting the appellees' theory as to Oscar Whitewing, Jr.,'s origin, and they cite cases such as Reed v. Scott, 50 Okla. 757, 151 P. 484, to the effect that circumstantial evidence may be accepted by the trier of fact to overcome positive testimony. We do not disagree with any of the cases cited, but we find therein no basis for holding in the present cases that the trial court erred in rendering its judgment in conformity with the positive testimony given on behalf of the appellees rather than basing it upon circumstances which do not directly contradict same. As we view the record, there was no circumstance left entirely unexplained in the present controversy that sufficiently refutes appellees' claim as to Oscar Whitewing, Jr.,'s origin and renders the trial court's judgment on the subject clearly against the weight of the evidence. It was not claimed nor shown that the child's birth to Katie Lee was impossible. Nor does the testimony introduced to establish the birth positively appear incredible in the light of the undisputed facts. The circumstances relied upon by the appellants are not of sufficient weight to prove that Katie Lee did not bear the child as she and her mother testified she did. They merely tended to make such birth appear improbable and to reflect upon the credibility of these two women who were the sole eyewitnesses of it. Therefore, under the general rule that the credibility of witnesses is ordinarily a matter for the exclusive determination of the trial court, we are not warranted in disturbing the judgments involved herein upon the question of whether Oscar Whitewing, Jr., was the son and heir of the deceased. See Muskogee Electric Traction Co. v. Cooper, 79 Okla. 271, 193 P. 39; Sabin v. Midland Savings & Loan Co., 178 Okla. 52, 61 P. 2d 1091. As to the extent to which the credibility of witnesses has been left to the trier of the facts and other related matters, see Chicago, R. I. & P. Ry. Co. v. Owens, 78 Okla. 114, 116, 189 P. 171, 174; Hubbard Banking Co. v. Koetsch, 105 Okla. 227, 231 P. 207; Aydelotte & Young v. Saunders, 182 Okla. 226, 77 P. 2d 50;

Wallace v. Wallace, 85 Mont. 492, 279 P. 374, 66 A. L. R. 587; 2 R. C. L. 194; R. C. L. Perm. Supp. p. 368; 64 C. J. 361, par. 350, and the cases cited in notes 86, 88, and 89 thereto. As said in Wat-tah-noh-zhe v. Moore, 36 Okla. 631, 129 P. 877 (quoted in White v. Morrow, 187 Okla. 72, 100 P. 2d 872):

". . . A court, like a jury, in weighing evidence, is guided largely by the appearance and demeanor of the witness on the witness stand, and considers the interest or lack of interest, the intelligence or lack of intelligence, the bias or lack of the same, the relation and opportunities of seeing and knowing the matters and things of and concerning which the witness testifies, etc. On review of the testimony in this court, all these important criteria and details are wanting. . . ."

In contending that the judgments of the trial court should be reversed, the appellants also call our attention to the fact that the appellees' evidence in the causes herein reviewed shows that no physician was in attendance at the birth of Oscar Whitewing, Jr., and that it occurred in the home where Katie Lee and her mother were living, whereas in the trial of the separate maintenance action Katie Lee obtained, on the basis of her testimony there, a substantial allowance for doctor bills and hospital expense which she claimed to have been incurred by reason of said birth. Said conflict was merely a matter to be taken into consideration by the trial court in determining Katie Lee's credibility. J. W. Crowdus Drug Co. v. Van Doren, 119 Okla. 55, 248 P. 319; and see, also, De Camp et al. v. Comerford, 134 Okla. 145, 272 P. 475.

The next phase of the argument concerns the question of whether Katie Lee Whitewing was shown to be of Indian blood, as the parties agree, was a necessary prerequisite under section 7 of the Act of Congress of February 27, 1925 (43 St. L. 1008) to the trial court's determination that she inherited a portion of her deceased husband's estate. The appellants not only argue that the judgment is against the weight of the better evidence as to whether Katie Lee was of Indian blood, but they also contend that portions of the evidence introduced to establish the affirmative of this issue were inadmissible, and having been admitted over their objection, its admission constitutes ground for reversal.

According to Katie Lee and the witnesses who testified in her behalf, her Indian blood is derived from her great grandmother, Margaret, and passed through the maternal side of her family, to her grandmother, Mary Cordelia Reese, who was the mother of Mrs. Davenport and the wife of J. B. Reese. The material conflict between the testimony of the witnesses for the appellants and those for the aforementioned appellee concerned the name, blood, and ancestry of Katie Lee's said grandmother and J. B. Reese's mother-in-law. The only witnesses for the appellants as to these points claimed to be sons and daughters of a half sister of the said Margaret. According to their testimony, her maiden name was Margaret Russell, and they had never heard of any Indian blood in her family. On the other hand, according to the evidence introduced on behalf of Katie Lee, including the testimony of J. B. Reese and various other relatives by blood and marriage of the grandmother, her maiden name was not Russell and she was of Indian blood. These witnesses related and based their conclusions largely upon family tradition, general reputation in the community, and the statements of the said Margaret, herself, before her death. The appellants assert that the testimony of the witnesses who quoted Margaret as saying that she was part Indian shows that she made such statements at a time when she was desirous of obtaining enrollment on the Indian rolls, but they call our attention to portions of the testimony of only two witnesses in support of this assertion. As there were other witnesses who testified to such statements by Margaret, when it does not appear that she had any interest of her own to serve thereby and could have had no selfish motive in making them, it is unneces-

sary for us to decide whether or not the testimony specifically referred to by appellants was inadmissible on account of the statements therein related being self-serving declarations of Margaret. The latter testimony was merely cumulative and tended to prove a fact sufficiently established by other competent testimony. Under such circumstances and in the absence of a showing of prejudice to the appellants by the admission of the testimony complained of, such admission, if error, must be regarded as harmless. See Corder v. Purcell, 50 Okla. 771, 151 P. 482.

Appellants also assert that much of the testimony tending to show the existence of Indian blood in Katie Lee's family was inadmissible on account of narrating statements to this effect that were made after the marriage of Katie Lee to Oscar Whitewing and the death of the latter. The only legal prohibition cited against the admission of said testimony, however, is the rule concerning declarations made when a dispute, controversy, or litigation is imminent or has begun, involving matters sought to be established by such testimony. The appellants do not point out any particular testimony in the record before us to which they say such a rule should apply, but it obviously does not apply to the greater portion of the evidence introduced on behalf of Katie Lee to prove the existence of Indian blood in her lineage. As we have hereinbefore pointed out, she claimed to have derived such blood from her great grandmother whose declarations concerning her Indian blood occurred many years before the present controversy.

As we have found that the errors alleged to have been committed by the trial court in the admission of evidence do not constitute cause for reversing the judgments involved herein and that said judgments are not clearly against the weight of the evidence in the particulars alleged, the same are hereby affirmed.

WELCH, C. J., CORN, V.C.J., and RILEY and OSBORN, JJ., concur.